# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69378-6-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| SAMUEL KENNETH MCDONOUGH, | ) | |
| Appellant. | ) | FILED: March 10, 2014 |

GROSSE, J. — Samuel McDonough contends evidentiary error and prosecutorial misconduct occurred during his trial for indecent exposure and attempted burglary. Because the errors, if any, were harmless, we affirm his conviction for indecent exposure.

## FACTS

Based on allegations that McDonough exposed himself to employees of a drive-through coffee stand and then attempted to enter the stand, the State charged him with felony indecent exposure and second degree attempted burglary, both with sexual motivation.

At trial, the State's evidence established that on February 2, 2012, Rachelle Hunt, Demi Ryerson, and Meisha Peffley were working at BigFoot Java, a drive-though/walk-up coffee stand in Issaquah. Around 8:00 a.m., McDonough walked up and ordered coffee. He paid for the coffee, left a tip, and asked to use a restroom. Hunt told him that their restroom was for employees only.

McDonough loitered on the property for the next 20 to 30 minutes. He sat down on a cinderblock ledge about six feet from the stand. He made odd facial

expressions and blew kisses at Ryerson and Hunt, who made sure that the stand's windows and doors were locked. Ryerson then noticed that McDonough had exposed his penis and was masturbating while looking at her. When customers walked up, he stopped temporarily, "putting his penis away."

Peffley subsequently observed McDonough masturbating and called 911. A recording of the call was played for the jury.

The women continued to watch McDonough from the back of the coffee stand via video surveillance cameras. When he could no longer see them through the coffee stand windows, McDonough approached the stand and looked in the windows. He appeared to turn the doorknob on the stand's door, but it was locked.

Around 8:35 a.m., Issaquah Police Officer Brian Horn arrived on the scene. He observed McDonough moving quickly up an embankment near the coffee stand. He apprehended McDonough, placed him under arrest, and searched him for weapons. Over relevance objections, Horn testified that McDonough had a folded pocket knife in his pocket.

Issaquah Police Officer Ronald Adams testified that he arrived at the scene after Officer Horn. All three women were hiding and "were obviously vis[ibly] shaken."

Shortly after 9:00 a.m., Officer Horn interviewed McDonough at the police station. An audio recording of the interview was played for the jury. During the interview, McDonough said he was high on methamphetamine and had used it six hours before. He also said he was diabetic and took insulin twice a day.

2

He told Officer Horn that he purchased coffee at the coffee stand, asked to use the restroom, and tipped the barista. When asked if he knew why the police showed up, he responded, "[S]ome girls were weirded [sic] out by me, uh, just hanging out around a parking lot." McDonough said, "I'm sure [the employees] could tell I was high on meth . . . because I just-couldn't sit still." When told that witnesses said he exposed his penis and masturbated, McDonough said, "They might have mistook something for something else." In response to additional questions about exposing himself, McDonough stated, "It's a court case" and explained that he was being as forthcoming as he could be under the circumstances.

McDonough talked about "being followed by the feds" and people on Myspace. He said "every time I do drugs, there's all kinds of things going on, all kinds of people. I don't know if they're following me . . . . I'm probably - you know, the drugs are having an effect but there's just got to be something going on."

McDonough said he had difficulty communicating with women or having relations with them. He also talked about social boundaries, saying that "[t]he boundaries and the limits that other people like live by, they don't apply to me." He then said, "I crossed some boundaries today," "I pushed boundaries." At one point, McDonough said, "[S]ociety at large is almost all based on emotions . . ., respect for each other . . ., do this and that and the other thing. I always seem to get that wrong . . . . And, uh, maybe I'm just looking for a shortcut."

Officer Horn described McDonough as "articulate," "intelligent with understanding what [Horn] was asking," and "actually even stopped himself and said, well, I have to think about how I want to say this."

The defense called Dr. Steven Juergens, a psychiatrist specializing in addiction. He testified that McDonough was suffering from methamphetamine-induced intoxication, hyperglycemia, and underlying paranoid schizophrenia at the time of the offense. According to Dr. Juergens, these conditions collectively caused a methamphetamine intoxication delirium that diminished McDonough's capacity to form the mental state for the offense—i.e., knowledge that his conduct would cause a reasonable person affront or alarm.

On cross-examintion, Dr. Juergens said McDonough told him that he had suffered from "meth-induced psychosis" on the day of the offense. McDonough also said he took "a huge shot of amphetamines" within several hours of the offense. When asked if his opinion would change if McDonough had actually used methamphetamine six hours before the offense instead of two, Dr. Juergens said that "even if he had done it four hours earlier, he still could have been in – in a delirious or a high state." Dr. Juergens conceded that substance abuse patients will sometimes lie to him.

Dr. Juergens testified that in his state of delirium, McDonough "wasn't making good decisions about what he was doing. He wasn't aware of all of the input and how it would affect people and what was happening." His paranoia also demonstrated a disordered thought process and contributed to his reduced awareness of the consequences of his actions. On cross-examination, Dr.

Juergens conceded that McDonough's behavior when he purchased coffee, conversed with the barista, and left a tip was more consistent with awareness of social acceptability than the absence of such awareness. Similarly, Dr. Juergens stated that McDonough's flight upon the arrival of police indicated that "on some level he had some sense that it's inappropriate to masturbate there . . . ."

Dr. Juergens was aware of McDonough's three prior incidents of indecent exposure. He conceded that he did not make an independent determination as to McDonough's mental state during those incidents. He said that McDonough told him he was high on cocaine or methamphetamine during those incidents. He admitted, however, that there was no evidence corroborating McDonough's claim as to two of the incidents. In the third incident, McDonough approached a woman, offered her cocaine, and while openly masturbating said, "I want to jump your bones, and I think you're so sexy."

The jury convicted McDonough of indecent exposure with sexual motivation, but acquitted him of attempted burglary and the lesser included crime of attempted criminal trespass.

## ANALYSIS

McDonough contends the trial court abused its discretion[1] when it admitted evidence that the arresting officer found a knife in his pocket. He argues that the knife was irrelevant and, alternatively, that any probative value of the evidence was substantially outweighed by the danger of unfair prejudice. We

---

[1] We review rulings on the admission of evidence for abuse of discretion. State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

need not decide whether the evidence was properly admitted because any error was harmless.

Error in admitting evidence is harmless "'unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'"[2] McDonough's knife was only mentioned once at trial and was not mentioned at all in closing argument. Significantly, the jury found McDonough not guilty of attempted burglary—the only offense that the knife was potentially relevant to. The acquittal on that charge demonstrates that, contrary to McDonough's assertions, the knife evidence did not trigger a desire "to remove McDonough from the community via incarceration, regardless of whether the State had met its burden of proving the charge beyond a reasonable doubt." Thus, even if the court abused its discretion, there is no reasonable probability that the error affected the verdict.

McDonough also contends that prosecutorial misconduct in closing argument denied him a fair trial. McDonough bears the burden of showing both improper conduct and prejudicial effect.[3] To establish prejudice, he must show a substantial likelihood that the misconduct affected the jury's verdict.[4] We view the challenged remarks in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the

---

[2] State v. Brown, 113 Wn.2d 520, 554, 782 P.2d 1013, 787 P.2d 906 (1989) (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).
[3] State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007 (1998).
[4] Brown, 132 Wn.2d at 561.

jury.[5] A prosecutor has wide latitude in closing argument to draw and express reasonable inferences from the evidence.[6]

McDonough contends the prosecutor committed misconduct when, over defense objections, he made the following remarks:[7]

> "I have never been more scared in my life." When **we** think of the moments in our lives when **we** have the greatest amount of fear, the greatest amount of apprehension, for Meisha that day was going to be February 2nd, 2012. And **we** have to only imagine what it must have been like having to put forward a happy face, try to serve more customers, while at the same time having that level of fear and anxiety that forces **you** to call 911 to get help.[8]
>
> . . . .
>
> . . . And **we** must also imagine what it must have been like for Demi as she's putting forward this happy face, trying to serve customers, but knowing how violated she feels, how disgusted she is of the Defendant's actions. And how, just the very nature of where these young women are, Big[F]oot Java - I mean, they're trapped inside - it's essentially a fishbowl, visible to the outside world. The only . . . physical boundary that separates them from the outside world is a plane of glass. And yet, at the same time, there are additional boundaries that we have in place as a community, social boundaries that shield us . . . . [that] shield us from the Defendant's-or-or, protect us from people's actions. And in this case, these are boundaries that should have protected Meisha, Demi, and Rachelle from the Defendant.[9]
>
> But the reality is, on February 2nd, these boundaries that should have protected those girls – the Defendant didn't care. He didn't care about these boundaries. [Portions of the defendant's recorded statement to police are played.]

McDonough claims these remarks were improper in two respects.

---

[5] Brown, 132 Wn.2d at 561.

[6] State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

[7] Br. of Appellant at 17 (appellant's emphasis).

[8] Defense counsel objected on grounds that the prosecutor's argument was "a simple appeal to fear." The trial court responded, "You've made your record."

[9] Defense counsel again objected, arguing that the prosecutor was appealing to community safety. The objection was overruled.

First, he contends the references to "social boundaries" were an improper appeal "to the jurors' notions of personal and community safety." We disagree. A prosecutor commits misconduct if he or she "'appeals to jurors' fear and repudiation of criminal groups'"[10] or argues "that the jury should convict in order to protect the community, deter future law breaking, or other reasons unrelated to the charged crime."[11] But the prosecutor's remarks in this case were directly related to the elements of the charged offense. To convict McDonough of indecent exposure, the jury had to determine that McDonough exposed himself "knowing that such conduct [was] likely to cause reasonable affront or alarm." In essence, the jury had to consider whether "the common sense of society would regard the specific act performed as indecent and improper."[12] The prosecutor's remarks regarding "social boundaries" were a proper attempt to illuminate this point.

Second, McDonough contends the emphasized portions of the remarks amounted to an improper "golden rule" argument because they urged the jury to sympathize with the victims by putting themselves in their shoes. Washington courts have held that "golden rule" arguments are generally improper because they invite the jury to decide the case "based on sympathy, prejudice or bias, rather than on the evidence and the law."[13] Our Supreme Court, however, has

---

[10] State v. Ramos, 164 Wn. App. 327, 338 n.3, 263 P.3d 1268 (2011) (quoting State v. Perez-Mejia, 134 Wn. App. 907, 916, 143 P.3d 838 (2006)).
[11] Ramos, 164 Wn. App. at 338 (emphasis added).
[12] State v. Eisenshank, 10 Wn. App. 921, 924, 521 P.2d 239, rev. denied, 84 Wn.2d 1003 (1974).
[13] Adkins v. Aluminum Co. of Am., 110 Wn.2d 128, 142, 750 P.2d 1257 (1988).

questioned whether the "golden rule" prohibition applies in criminal cases.[14] Nevertheless, even assuming the prohibition applies here, we conclude there was no prejudicial misconduct.

A "golden rule" argument is improper to the extent it encourages the jury to depart from neutrality and to decide the case "on the basis of personal interest and bias rather than on the evidence."[15] As noted above, the indecent exposure charge required the State to prove that McDonough exposed himself "knowing that such conduct [was] likely to cause reasonable affront or alarm."[16] Thus, what the victims observed, how they reacted, and how a reasonable person would likely react in the victims' circumstances, were all relevant considerations in determining whether McDonough's conduct would likely cause reasonable affront or alarm. As McDonough himself observes, "the victims' fears were relevant to the charges and the prosecutor could properly highlight their testimony." Viewed in this context, the challenged remarks were not an appeal to decide the case on sympathy, but to assess the fear or alarm that a reasonable person would experience in the victims' circumstances. This was within the range of proper argument.

To the extent that asking the jury to "imagine," rather than consider, the victims' fear was misconduct, there is no substantial likelihood that the remarks affected the verdict. The remarks were brief and the court instructed the jury that their decision was to be based on the evidence and not on "sympathy, prejudice,

---

[14] State v. Borboa, 157 Wn.2d 108, 124 n.5, 135 P.3d 469 (2006).
[15] Adkins, 110 Wn.2d at 139.

9

or personal preference." The jury is presumed to follow the court's instructions, and their acquittal on the burglary charge is proof that they did.[17] In addition, the State presented a strong case and McDonough's mental state defense was severely undermined by his prior acts of indecent exposure, his post-arrest interview, and the fact that he stopped exposing himself when customers approached the coffee stand.

Affirmed.

_____

WE CONCUR:

_____                    _____

---

[16] (Emphasis added.)
[17] State v. Russell, 125 Wn.2d 24, 84, 882 P.2d 747 (1994), cert. denied, 514 U.S. 1129 (1995).