# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50414-6-II |
| Respondent, | |
| v. | |
| KEITH ROBERSON, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Keith Roberson appeals his convictions of two counts of second degree assault. He argues that (1) the prosecutor committed misconduct by arguing that Roberson created the need for self-defense, and by asking him to speculate about the motives of another witness; (2) that insufficient evidence supports the second count of second degree assault; and (3) that the trial court erred by not imposing an exceptional downward sentence. Finding no error, we affirm.

## FACTS

Around 3:00 a.m., Roberson and a woman were using methamphetamine in Roberson's van. The woman took the drugs and paraphernalia and then jumped out of the van as a car pulled in behind the van. A man exited the car, and approached the van lunging at Roberson with "brass knuckles with a fixed dagger on the end." Verbatim Transcript (VT) at 474. Roberson quickly drove away, stopping near a wooded area. He then grabbed his gun, exited his van, and ran into the wooded area. He continued running, and eventually encountered Michael Walters's

house. He knocked on, and then opened, Walters's door. Roberson was agitated and upset, screaming for help, and for someone to call 911.

Walters called 911. Walters reported to the dispatcher that Roberson told him that Roberson was being chased and appeared scared. Walters also told the 911 dispatcher that Roberson had a pistol, and had fired it "kind of at the ground." VT (Excerpt Trial Day 1) at 32. While on the phone with 911, Walters asked Roberson not to shoot.

Michael Elkhart, Walters's neighbor, heard screaming. He called 911, and ran outside with a flashlight. Elkhart approached Walters's yard, still holding a flashlight. Elkhart was approximately 40 to 50 feet away from Walters, and saw Roberson and Walters talking at Walters's door. Roberson began aiming the gun toward Elkhart, and Walters told Elkhart to leave. Roberson shot in Elkhart's direction, hitting a fence. Roberson then aimed his gun at Walters, and Walters asked Roberson not to point it at him and to put away the gun. Roberson was crying and told Walters, "I don't want to die, but I'm not going to go out alone." VT (Excerpt Trial Day 1) at 93.

At various times, Roberson tried to speak with the 911 dispatcher. Roberson did not believe that a 911 dispatcher was on the phone.

Clallam County sheriffs arrived and arrested Roberson. The State charged Roberson with first degree assault of Elkhart, with intent to inflict great bodily harm, while armed with a firearm, and second degree assault of Michael Walters, with a deadly weapon, while armed with a firearm. At trial, Roberson, Walters, Elkhart, and a Clallam County Sheriff's Deputy testified consistently with the above facts. Walters also testified that despite his request, Roberson

continued to aim the gun at him. Additionally, Walters's and Elkhart's 911 calls were admitted. The transcribed 911 calls show that Roberson was crying and yelling throughout the call.

Roberson testified that he used methamphetamine, and was using methamphetamine on the night of the incident. He explained that he was "making a lot of noise" and "screaming and hollering because [he] wanted somebody to find out where [he] was," and that he twice "fired a warning shot." VT at 483. He testified that he was not trying to hurt Elkhart or Walters, but wanted someone to call the police for him. He also acknowledged that even though he heard Walters ask him to put the gun away, he did not.

The following exchange occurred during the State's cross-examination of Roberson:

Q. Okay, you said you remember everything?

A. Yes, ma'am, I do.

Q. Do you remember him saying to you please put that away?

A. Yes.

Q. Okay. And that was the gun he was telling you to please put away?

A. Yes.

Q. And you didn't put it away?

A. No.

Q. Um, do you remember him saying don't shoot?

A. Yes.

Q. In fact, he said don't shoot more than once; right?

A. Yes.

Q. Okay. Do you remember him saying don't point it at me?

A. I heard him say that.

Q. Okay, and he said that more than once; right?

A. Yes, he did.

Q. And you were pointing the gun at him?

A. No, I wasn't.

Q. So, he was just—you weren't pointing the gun at him, and he was just saying don't point it at me for—

A. Absolutely, because he was on the phone with dispatch. But the reason why he was saying don't point the gun at me, don't point the gun at me, I'm just looking at him hollering for help.

Q. So he was just making that up?

A. He was—that's all, don't point the gun at me, don't point the gun—I wasn't—I had no reason—I had no—this man's saving my life. I had no reason to point the gun at him, I didn't want anything from him but help. I just wanted him to help me.

Q. So he was just making that up for 911?

A. Yes—

MR. ANDERSON: Objection as to the motives of the witness.

THE COURT: Overruled.

THE WITNESS: I never pointed the gun at him.

VT at 499-501.

4

The jury was instructed on first degree assault, and the lesser included crime of second degree assault. The jury was also instructed on self-defense to assault.[1] During closing argument, the prosecutor argued:

> So, my argument is how can someone argue self-defense when they create the situation. When he essentially through his own behavior, brings someone into the area of danger, and when they come, he shoots at them. And then says well, I was defending myself—

VT at 577. Roberson objected to the prosecutor's comment on the grounds that the prosecutor's comment was an improper first-aggressor argument. The State agreed that the argument that Roberson "created the risk" was improper. VT at 580. The trial court then instructed the jury to disregard the prosecutor's argument that Roberson created the risk.

The jury found Roberson guilty of two counts of second degree assault while armed with a firearm.

Dr. Kenneth Muscatel performed a psychological evaluation for sentencing purposes. He found that "it is likely that methamphetamine played a very significant role in the incident," as well as "mental health impairment." Clerk's Papers (CP) at 45. He also determined that in addition to methamphetamine use, Roberson "likely ha[d] symptoms of a significant mental disturbance at the time of the incident, and those factors likely affected his behavior, thinking, judgment, and emotional responses at that time." CP at 45. "It is likely his impaired mental status, reflecting both pre-existing mental health impairment and chronic features of impaired

---

[1] The trial court's instruction reflected the language provided in 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 17.02 (3d ed. 2008)("Lawful Force—Defense of Self, Others, Property").

mental health, as well as his use of methamphetamine at the time, were the likely participants of this rather bizarre incident." CP at 45.

Roberson asked the trial court to consider evidence of mental illness as grounds for an exceptional downward sentence under RCW 9.94A.535(1)(e). He also requested that the court impose the firearm enhancements to run concurrently under *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017). The trial court considered Dr. Muscatel's report, but declined imposing an exceptional sentence, finding that the mitigating factors in RCW 9.94A.535 were inapplicable. The court also found that to the extent that Roberson was "not capable of appreciating the wrongfulness of [his] behavior that night, that was largely attributable to the fact that [he] . . . had voluntarily consumed the methamphetamine." VT at 653-54. The trial court imposed the firearm enhancements to run consecutively. Roberson appeals.

ANALYSIS

A. PROSECUTORIAL MISCONDUCT

1. *Legal Principles*

To establish prosecutorial misconduct, a defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). If a defendant establishes that the prosecutor's conduct was improper, we then determine whether he was prejudiced. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Where an objection was made, a defendant must "show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Emery*, 174 Wn.2d at 760. Where a trial court issues a curative instruction, we presume the jury

follows the court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010).

In reviewing a prosecutor's comments during closing argument, we look to the context of the total argument, the issues presented in the case, the evidence addressed in the argument, and the jury instructions. *State v. Jackson*, 150 Wn. App. 877, 883, 209 P.3d 553 (2009). A prosecutor has wide latitude to draw reasonable inferences from the evidence and to express such inferences to the jury during closing argument. *Thorgerson*, 172 Wn.2d at 448.

2. *Closing Argument*

Roberson argues that the prosecutor committed misconduct by arguing that Roberson had "no right to assert self-defense." Br. of App. at 15. Specifically, Roberson assigns error to the prosecutor's argument that Roberson created the dangerous situation, and then claimed self-defense. We hold that although the comment was improper, the trial court's instruction cured any possible prejudice.

Roberson cites *State v. Davenport*, to support his argument, but that case is distinguishable. 100 Wn.2d 757, 675 P.2d 1213 (1984). In *Davenport*, although the defendant was not charged as an accomplice and the jury was not instructed on accomplice liability, the prosecutor argued that he was guilty as an accomplice. *Davenport*, 100 Wn.2d at 759-60. The defendant objected to the argument, but the trial court overruled the objection. *Davenport*, 100 Wn.2d at 759. Further, during deliberations, the jury asked the court for "a definition of 'accomplice' in terms of participation in the crime." *Davenport*, 100 Wn.2d at 759. The Supreme Court held that the prosecutor's argument was improper, and the record demonstrated

that the jury considered the improper arguments, and may have been prejudiced by it. *Davenport*, 100 Wn.2d at 763, 765.

Here, Roberson's objection was sustained and the trial court instructed the jury to disregard the prosecutor's argument.  Roberson baldly asserts that even though the court issued a curative instruction, there is a reasonable probability that the prosecutor's comment affected the jury's verdict.[2]  But where a trial court issues a curative instruction, we presume the jury follows the court's instructions.  *Anderson*, 153 Wn. App. at 428.  Accordingly, Roberson's argument fails.

3.  *Cross-Examination*

Roberson claims that the prosecutor committed misconduct during cross-examination of Roberson when she asked Roberson if Walters was "making this up for 911."  Br. of App. at 17. Specifically, Roberson argues that the prosecutor improperly asked Roberson to opine on whether a witness was being honest.  We disagree.

It is improper for a prosecutor to ask a witness whether another witness is lying.  *State v. Ramos*, 164 Wn. App. 327, 334, 263 P.3d 1268 (2011).  Some factors we consider in determining whether a prosecutor's misconduct likely affected the verdict, are "whether the prosecutor was able to provoke the defense witness to say that the State's witness must be lying, whether the State's witness's testimony was believable and/or corroborated, and whether the

---

[2] Roberson does not challenge the trial court's curative instruction or otherwise explain his contention that the court's curative instruction was ineffective.

defense witness's testimony was believable and/or corroborated." *State v. Padilla*, 69 Wn. App. 295, 301, 846 P.2d 564 (1993).

The prosecutor did not provoke Roberson to testify that another witness must be lying. Because the prosecutor did not ask Roberson if another witness's testimony was a lie, the authority that Roberson relies upon is distinguishable. The prosecutor asked Roberson about a prior occurrence with Walters. Moreover, even assuming that the prosecutor's question was improper, Roberson has not demonstrated a substantial likelihood that the misconduct affected the verdict. Walters's 911 call was admitted and played for the jury, and was consistent with Walters's testimony. Walters testified that Roberson aimed the gun at him after he asked Roberson to put away the gun. And Walters testified that Roberson fired the gun after Walters asked him not to. Given the overwhelming evidence supporting Walters's testimony, Roberson has not demonstrated a substantial likelihood that the improper conduct affected the verdict.

B.     SUFFICIENCY OF THE EVIDENCE

Roberson argues that his conviction of second degree assault of Walters (count 2) is not supported by sufficient evidence. Specifically, he contends that there is insufficient evidence of Roberson's specific intent to create apprehension and fear of bodily injury. We disagree.

Due process requires the State to prove every element of the charged crimes beyond a reasonable doubt. *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015). We review sufficiency of evidence claims for whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182

(2014). In a challenge to the sufficiency of the evidence, the defendant admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *Homan*, 181 Wn.2d at 106. We consider circumstantial evidence as probative as direct evidence. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). We may infer specific criminal intent of the accused from conduct that plainly indicates such intent as a matter of logical probability. *Goodman*, 150 Wn.2d at 781. We also "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

RCW 9A.36.021(1)(c) provides that "[a] person is guilty of assault in the second degree if he or she . . . [a]ssaults another with a deadly weapon." The statute does not define "assault," thus, courts must resort to the common law definition. *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). Washington recognizes three common law definitions of assault: "(1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm." *Elmi*, 166 Wn.2d at 215. The trial court defined assault in its instruction to the jury:

> An assault is an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
>
> An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

No. 50414-6-II

CP at 75.

Roberson and the State agree that second degree assault of Walters in count 2 was based on the intentional creation of apprehension. Roberson contends that there was insufficient evidence that Roberson intended to create apprehension of bodily injury. He argues that because he did not intend to make Walters fearful, and because he did not verbally threaten Walters or use his gun to demand entry into Walters's home, there was no evidence of intent to create apprehension.

But the record shows that Roberson was frantic and crying for help, and that he pointed his gun at Walters, despite Walters's request not to point it at him. Further, the record shows that despite Walters asking Roberson not to shoot the gun, Roberson shot it twice. And we take all evidence in the light most favorable to the State. A rational jury could have inferred that Roberson screaming and pointing the gun at Walters after Walters asked him not to, coupled with Roberson firing two "warning shots," constituted an intent to create apprehension and fear in Walters. Moreover, Roberson testified that he was not trying to hurt Elkhart or Walters, but wanted someone to call the police for him, from which a rational jury could infer Roberson was using fear of the gun to force them to call 911. Accordingly, we hold that that a rational jury could have inferred the necessary intent from the evidence presented at trial.

C.   SENTENCING

Roberson argues that the trial court erred by not imposing an exceptional sentence downward. Specifically, he claims that the trial court did not exercise its discretion because it believed that it did not have discretion to impose an exceptional sentence where the record

11

indicated both that Roberson suffered from mental illness and was under the influence of methamphetamines. Roberson also claims that the trial court did not consider whether an adult's mental illness was a mitigating factor under *State v. Houston-Sconiers*. We hold that the trial court did not abuse its discretion when it refused to impose an exceptional sentence.

A standard range sentence is generally not appealable. RCW 9.94A.585; *State v. Osman*, 157 Wn.2d 474, 481-82, 139 P.3d 334 (2006). However, where, as here, a defendant has requested an exceptional sentence below the standard range, we can review the denial if the trial court either refused to exercise its discretion, or relied on an impermissible basis for refusing to impose an exceptional sentence. *Osman*, 157 Wn.2d at 482; *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997).

RCW 9.94A.535(l)(e) authorizes an exceptional sentence below the standard range if a preponderance of evidence shows that

> [t]he defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired. Voluntary use of drugs or alcohol is excluded.

Imposition of an exceptional sentence under RCW 9.94A.535(1)(e) is permissible only if the record establishes that the defendant's impairment existed independent of any voluntary use of drugs or alcohol. *See State v. Allert*, 117 Wn.2d 156, 167, 815 P.2d 752 (1991). Roberson claims the sentencing court erroneously believed that any voluntary use of drugs precluded imposition of a mitigated exceptional sentence. But the record fails to support this claim.

The trial court considered Dr. Muscatel's report. Dr. Muscatel's report stated:

12

> [I]t is likely that methamphetamine played a very significant role in the incident. . . . It is likely that methamphetamine exacerbated [Roberson's impaired mental health.]. . . .
>
> It is likely his impaired mental status, reflecting both pre-existing mental health impairment and chronic features of impaired mental health, as well as his use of methamphetamine at the time, were the likely participants of this rather bizarre incident."

CP at 45. Dr. Muscatel's report did not establish that the effect of Roberson's mental impairment could be separated from the effects of his voluntary drug use.

The trial court found that to the extent that Roberson was "not capable of appreciating the wrongfulness of [his] behavior that night, that was largely attributable to the fact that [he] . . . had voluntarily consumed the methamphetamine." VT at 653-54. The trial court considered the impaired-capacity mitigating factor, but found it inapplicable based on the evidence presented. The trial court neither refused to consider an exceptional sentence, nor relied on an impermissible basis for declining to impose an exceptional sentence. Thus, the trial court properly exercised its discretion and its decision declining to impose an exceptional sentence is not reviewable.

Roberson also argues that the trial court should have considered his mental illness as a basis for imposing an exceptional downward sentence under *State v. Houston-Sconiers*, 188 Wn.2d 1. But *Houston-Sconiers* addresses the trial court's discretion in sentencing a juvenile, and is inapplicable here. 188 Wn.2d at 23, 34. Roberson was not a juvenile, and has not provided argument or authority demonstrating that the trial court erred by not granting an exceptional sentence based on *Houston-Sconiers*. Accordingly, his claim fails.

We affirm.

No. 50414-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, P.J.

We concur:

_____
Melnick, J.

_____
Sutton, J.