IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

ABRAHAM K. FELICIANO,

Appellant.

No. 86216-2-I

DIVISION ONE

UNPUBLISHED OPINION

CHUNG, J. — Abraham Feliciano was convicted of resisting arrest and assault in the second degree. On appeal, he contends that even though he was not convicted of assault in the first degree, the court erred by denying his motion to dismiss that charge because there was insufficient evidence. He also argues that insufficient evidence supports his conviction for resisting arrest and that prosecutorial misconduct denied him a fair trial. Finally, he requests a remand to correct a scrivener's error. We affirm the convictions and remand to correct the scrivener's error in the judgment and sentence.

FACTS

On May 11, 2023, a man later identified as Feliciano appeared to throw a shopping cart down a set of stairs in Bellingham's Maritime Heritage Park. According to Diogo Coser, who was walking through the park with Natalie Coffeen, the man was yelling at two people and appeared to lunge at their dog. Wanting to stop the conflict, Coser yelled toward the group, but no one in the group appeared to notice him. Coser then observed the man begin to chase one of the people.

The chase continued down the stairs and stopped to the right of Coser's view, near trees at the edge of the park. Norman Kelly was resting in a hammock among the trees. Coser and Coffeen then watched the man who threw the shopping cart push Kelly out of the hammock and onto the ground and begin to attack him. Coser believed the assailant had some sort of knife and stabbed Kelly. Coser later testified at trial that he could not see the item clearly. While watching the exchange, Coser called 911, and Coffeen took a 20-second video of the incident with her cellphone. The video captured Kelly already on the ground with the other man walking towards him and striking at him. During the 911 call, Coser described the assailant as a "Hispanic" man with a "black jacket, black backpack, [and] jean shorts," wearing "one white sock and one orange sock." At the time of the call, he also reported the person was walking up the park stairs.

The Bellingham Police Department dispatched several police officers to the park in response to the 911 calls from Coser and another witness to the event, Macie Picard.[1] Officer Richard Alves was the first responding officer to arrive on the scene. Upon exiting his patrol vehicle, Alves walked toward a set of stairs that had a wide view of the park and encountered an individual with clothing matching the description shared over police dispatch. The individual was standing with a tricycle laden with what appeared to be personal belongings. Alves later identified Feliciano in court as the man he encountered in the park.

Once Alves recognized Feliciano as matching the description, he told Feliciano he was "detained" and that he was "not free to leave." Feliciano did not leave, but yelled

---

[1] The trial court entered an order memorializing its rulings excluding portions of Coser's 911 call and the officers' body-worn video. As the exhibits were not actually redacted but rather stopped and started in court according to the court's ruling, it is necessary to review this order along with the exhibits to understand what evidence was presented to the jury.

back at the officer "I'm not detained" and told the police to back up. He also called the officer a "fool," used curse words, and referred to himself as "a seven officer move" a handful of times. Based on the 911 call and from what Alves could see at a distance, he believed Feliciano was armed with a knife and yelled at Feliciano to drop it. Feliciano dropped the object he was holding, which turned out to be a bicycle pump. At this point, other responding officers had also joined Alves and Feliciano on the stairs.

Officer Patrick Pena asked Feliciano if he wanted other officers to talk to the person in the hammock. Feliciano agreed, and Pena requested Feliciano "hang out" while they did so. Feliciano said he would "stay here" and that he would move his bike down the stairs, while mounting the bike. Pena asked if Feliciano could "just leave [the bicycle] there for now," and Feliciano did not respond. Concerned Feliciano was about to leave, the officers moved closer to him, and they demanded he move away from the bike or else risk being "tased or bean bagged."[2] He dismounted the bike as they approached and began yelling at the officers to back up. Several officers shot tasers at Feliciano's chest and torso. The prongs appeared to hit him, but the officers speculated that his leather jacket prevented them from adhering and impacting him.

An officer then told Feliciano that he would be "beanbagged" if he did not move to the middle of the landing and get on the ground. Feliciano moved to the middle of the landing but did not get down on the ground. Officers told Feliciano that he was under arrest, and Feliciano responded that there was no probable cause and the police were "dirty" and "corrupt." Officers fired more tasers at Feliciano, who announced he was

---

[2] Alves described the item as a "12-gauge less lethal launcher." He testified that it is similar to a "12-gauge shotgun but it carries drag-stabilized baton rounds, which [are] . . . referred to as . . . beanbag rounds."

3

removing a taser prong from his sock. Officers then shot Feliciano with a beanbag, after which Feliciano sat on the stairs. Officers then arrested him.

Meanwhile, Kelly was taken to the hospital for the injury he sustained during the assault. An emergency department physician testified that Kelly sustained a 15-centimeter laceration through his triceps and the cut was deep enough to expose the muscle.

The State charged Feliciano with assault in the first degree and resisting arrest. After the State rested its case, Feliciano moved to dismiss the charge of assault in the first degree due to insufficient evidence that Feliciano used a deadly weapon or intended to inflict great bodily harm. The court denied the motion. The jury instructions included an instruction for assault in the first degree, as well as for assault in the second degree with a deadly weapon and assault in the fourth degree. The jury convicted Feliciano of assault in the second degree and resisting arrest. Feliciano timely appeals.

DISCUSSION

Feliciano appeals his conviction on three primary bases. First, he argues that the court erred by denying his motion to dismiss the charge of assault in the first degree because there was insufficient evidence of intent to inflict great bodily harm with a deadly weapon. Second, he challenges the sufficiency of evidence for his conviction of resisting arrest, as the jury could have impermissibly relied on his protected speech to determine he intentionally prevented his arrest. Third, he argues prosecutorial misconduct during closing argument denied his right to a fair trial. Additionally, he

requests a remand to correct a scrivener's error on his judgment and sentence, as it improperly reflects the basis for his conviction.

I. Denial of the Motion to Dismiss Charge of Assault in the First Degree

Feliciano contends the trial court should have dismissed the charge of assault in the first degree because there was insufficient evidence that Feliciano intended to inflict great bodily harm with a deadly weapon when he struck Kelly, so the State could not have presented inferior degree assault crimes to the jury. The State counters that there was sufficient evidence to support the conviction and that "in any event, any error is harmless because Feliciano was not convicted of first-degree assault." We agree with the State.

Under article I, section 22 of the Washington Constitution, "an accused person must be informed of the charge" they are "to meet at trial, and cannot be tried for an offense not charged." State v. Pelkey, 109 Wn.2d 484, 487, 745 P.2d 854 (1987). "An amendment during trial stating a new count charging a different crime violates this provision." Id. But a trial court may allow amendment to the information at any time before the verdict as long as the "substantial rights of the defendant are not prejudiced." CrR 2.1(d). "[T]he defendant has the burden of demonstrating prejudice under CrR 2.1(d)." State v. Hockaday, 144 Wn. App. 918, 927, 184 P.3d 1273 (2008). And "under RCW 10.61.003, a defendant can be found guilty of a crime that is an inferior degree of the crime charged." State v. Fernandez-Medina, 141 Wn.2d 448, 453, 6 P.3d 1150 (2000). Thus, the State may amend even after it rests its case-in-chief if "the amendment is to a lesser degree of the same charge or a lesser included offense." Pelkey, 109 Wn.2d at 491.

5

Feliciano does not dispute that assault in the second degree with a deadly weapon is an inferior degree offense to assault in the first degree with a deadly weapon. See State v. Fernandez-Medina, 141 Wn.2d at 455. Therefore, the State could amend the information to add the charge of assault in the second degree even after it rested its case-in-chief because "the amendment is to a lesser degree of the same charge." Pelkey, 109 Wn.2d at 491.

After denying Feliciano's motion to dismiss, the court instructed the jury on both assault in the first degree and in the second degree.[3] Feliciano does not satisfy his burden under CrR 2.1(d) of establishing prejudice from the added charge of assault in the second degree. As the jury did not find Feliciano guilty of assault in the first degree, any error from the trial court's denial of his halftime motion to dismiss that charge was harmless.[4] Although the jury convicted Feliciano instead of the inferior offense of

---

[3] An instruction on an inferior degree offense is properly administered when

(1) the statutes for both the charged offense and the proposed inferior degree offense "proscribe but one offense"; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense.

State v. Peterson, 133 Wn.2d 885, 891, 948 P.2d 381 (1997) (quoting State v. Foster, 91 Wn.2d 466, 472, 589 P.2d 789 (1979)). "[W]hen substantial evidence in the record supports a rational inference that the defendant committed only the lesser included or inferior degree offense to the exclusion of the greater offense, the factual component of the test for entitlement to an inferior degree offense instruction is satisfied." Fernandez-Medina, 141 Wn.2d at 462. On appeal, Feliciano makes no argument that the third part of the test from Peterson and Foster, "the factual component" of the second degree assault charge, was not satisfied here.

[4] Given this disposition, while we need not address the argument that there was insufficient evidence to support the charge of assault in the first degree, we conclude there was sufficient evidence. The key distinction between assault in the first degree and assault in the second degree, as charged, is that assault in the first degree additionally requires the defendant to assault another with a deadly weapon "with intent to inflict great bodily harm." RCW 9A.36.011(1)(a); compare RCW 9A.36.021(1)(c) (defining assault in the second degree, in pertinent part, as assault with a deadly weapon "under circumstances not amounting to assault in the first degree").

Feliciano does not challenge the sufficiency of the evidence except as to whether he intended to inflict great bodily harm with a deadly weapon when he struck Kelly. The evidence at trial included that Feliciano wielded a knife-like item as he struck at Kelly and that Kelly suffered a serious wound. While Kelly could not be located to testify at trial, two witnesses, Coffeen and Coser, both testified that Feliciano attacked Kelly with a knife. Cellphone video footage of the encounter also shows Feliciano carrying an

assault in the second degree, he does not challenge the sufficiency of evidence as to that conviction.[5] We conclude the trial court did not err by denying Feliciano's motion to dismiss the charge of assault in the first degree.

## II. Sufficiency of Evidence of Resisting Arrest

Feliciano also argues that there was insufficient evidence to support his conviction for resisting arrest. Specifically, he contends that his "vocal complaints about being detained and his delay in getting on the ground do not show he intentionally prevented his arrest as required to prove the offense."

Whether sufficient evidence supports a defendant's conviction is a question of law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). To determine whether sufficient evidence supports a conviction, an appellate court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also State v. Zghair, 4 Wn.3d 610, 619-20, 567 P.3d 1 (2025). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from

---

object resembling a knife as he walks away from Kelly. And although officers recovered only a small folded pocketknife from Feliciano and never located an item that matched the description of the item witnesses provided, Kelly's injury demonstrated the item used was capable of causing substantial bodily harm. The attending physician described the injury as a "15 centimeter laceration" that was deep enough to cut muscle and confirmed Kelly sustained a "serious wound."

As for intent, Coffeen recounted watching Feliciano pushing Kelly out of the hammock, kicking him, and hitting him in the arm with a knife. Coser corroborated Coffeen's testimony. Picard testified that Feliciano "seemed very angry like he wanted to hurt somebody," that Feliciano swung his arms and appeared to be attacking Kelly "from above," and told the 911 operator that Feliciano was "beating the shit out of this other guy." Carlson also testified that she watched one person stand over the other and move their arms repetitively up and down. A rational trier of fact could infer from this evidence that Feliciano intended to cause great bodily harm with a deadly weapon when he struck Kelly.

[5] Wash. Ct. of Appeals, oral argument, State v. Feliciano, No. 86216-2-I (July 16, 2025), 19 min., 49 sec. to 19 min., 55 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025071110/?eventID=2025071110.

that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. Circumstantial and direct evidence are equally reliable. State v. Lazcano, 188 Wn. App. 338, 363, 354 P.3d 233 (2015).

To support a conviction for resisting arrest, the State had to prove: "(1) That on or about May 11, 2023 [Feliciano] prevented or attempted to prevent a peace officer from arresting him; (2) That [Feliciano] acted intentionally; (3) That the arrest or attempt to arrest was lawful; and (4) That any of these acts occurred in the County of Whatcom." See RCW 9A.76.040. "Prevent" is defined as "to keep from happening." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1798 (2002). Feliciano claims that without the evidence of his constitutionally protected speech, there is insufficient evidence to support the first element of his resisting arrest conviction.

"One may resist arrest by various types of conduct." State v. Williams, 29 Wn. App. 86, 92, 627 P.2d 581 (1981). A defendant need not use force to be convicted of resisting arrest. State v. Calvin, 176 Wn. App. 1, 13, 316 P.3d 496 (2013) ("force" is not an element of the crime). Statements can be considered in conjunction with actions to interpret intent. See State v. Ware, 111 Wn. App. 738, 745, 46 P.3d 280 (2002). Moreover, "[a] conviction may be based on an individual's conduct even if he or she engaged in protected speech," State v. E.J.J., 183 Wn.2d 497, 504 n.7, 354 P.3d 815 (2015). However, "a conviction for obstruction may not be based *solely* on an individual's speech because the speech itself is constitutionally protected." Id. at 502 (emphasis added). Therefore, the reviewing court must "engage in a careful review of

8

the record to ensure that [the defendant's] conviction could not have been based on speech alone." Id. at 503-04.

Feliciano relies primarily on E.J.J., in which the court held there was insufficient evidence to support the conviction for obstruction under RCW 9A.76.020(1) because the record indicated the conviction was "based solely on [the defendant's] words." 183 Wn.2d at 504, 508. There, the defendant did not comply with officer commands to leave the scene of an investigation immediately outside his home and he used "disrespectful, discourteous, and annoying" language towards the officers from his porch as the investigation was ongoing. Id. at 500-01. However, he did not "physically interfere with or touch" anyone involved in the investigation and "did not make any threatening movements toward the officers at any time." Id. at 505. The court disagreed that "mere presence" could constitute conduct that escalated the situation, given that the record did not establish any connection between the defendant's speech or presence and "anything that specifically resulted from it." Id. The defendant's refusal to leave the scene and his aggressive commentary towards the officers were not sufficient to support the obstruction conviction because the exchange was "so intertwined" with the defendant's protected speech. Id. at 505-06.

By contrast, in State v. Ware, the court affirmed a conviction for resisting arrest, reasoning that the defendant's statement "your [sic] not going to take me" could be understood as an intention to resist arrest when after making the comment, the defendant immediately ran from an officer. 111 Wn. App. at 740, 745. Another case in which the court held there was sufficient evidence to affirm defendant's conviction for resisting arrest, State v. Calvin, is also informative. 176 Wn. App. at 14. There, the

defendant refused to get on the ground during a confrontation between himself and a park ranger. Id. at 8-9, 13. The defendant argued that he did not use force in resisting arrest and was "merely recalcitrant." Id. at 13.[6] The court disagreed, reasoning that "force" is not an element of the crime and there was sufficient proof because the defendant was told to stop resisting but instead struggled with the officer for over a minute before the officer was able to handcuff and get him "fully under . . . control." Id. at 13-14.[7]

Here, the parties agree that the statements and conduct relevant to the sufficiency analysis occurred after Feliciano was aware he was under arrest.[8] Like the defendant in Calvin, despite knowing he was under arrest, Feliciano impeded the officers' ability to get him fully under control. Officers had already asked Feliciano to get down onto the ground; then, as he moved towards the middle of the landing, they told him he was under arrest and repeated the command to get on the ground.

At that point, a few officers attempted to tase Feliciano again, and Feliciano shouted about being tased and asked, "What are you doing?" Feliciano then walked to the other side of the landing and said, "You've hit me several times, for what," while officers repeated instructions to get onto the ground or else be hit again. Officers again

---

[6] Calvin also argued that he did not know the arresting person was an officer or that he was under arrest. Calvin, 176 Wn. App. at 12.

[7] In E.J.J., the court disagreed that evidence of an officer being eventually required to escort the defendant back into his home qualified as delay, reasoning that "minor delay is of no import," and states cannot constitutionally " 'abridge those freedoms to obviate slight inconveniences or annoyances.' " 183 Wn.2d at 506 (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 501-02 (1949)). But as discussed above, the court in E.J.J. reversed the conviction because it was based on the defendant's protected speech rather than the conduct. Id. at 505. Moreover, the case involved obstruction, so is of limited value in determining sufficiency of evidence of the crime of resisting arrest that is at issue here.

[8] Wash. Ct. of Appeals, oral argument, State v. Feliciano, No. 86216-2-I (July 16, 2025), 1 min., 30 sec. to 1 min., 48 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025071110/?eventID=2025071110.

fired their tasers at Feliciano, repeated the command that he get on the ground, and reiterated that he was under arrest "for assault two." Feliciano yelled back "bullshit" and that the officers had "no probable cause." The officers responded that they did have probable cause and that Feliciano needed to sit down because he was under arrest. Feliciano asked "on who," and the officers stated "on you," while again requesting he sit on the ground so he could be arrested. Feliciano then shouted "no, you guys are dirty, you are the most corrupt there is." The officers again reiterated he needed to sit down so he could be taken into custody, and Feliciano responded "no, I don't get taken into custody, I'm Abraham." During the exchange, Feliciano was still standing, with his back against the stair railing and his leg raised with his knee folded. A reasonable inference from this posture was that he would kick out if approached.

When officers responded that there was probable cause to arrest him for assault, Feliciano responded, "No! I don't get taken into custody!" His repeated statements contesting the officers' efforts to take control over him, while alone are insufficient to support his conviction, could be interpreted as an intention to resist because Feliciano continually refused to follow the officer commands for over one minute. Compare Ware, 111 Wn. App. at 740, 745 (defendant's statement "your [sic] not going to take me" could be interpreted as an intention to resist arrest when considered in conjunction with her actions).

Feliciano continued to stand against the railing, proceeded to remove some of the taser prongs from his clothing, and also asked the officers to remove the prongs. An officer then fired a beanbag and hit Feliciano, which caused him to sit on the steps. Two officers then approached Feliciano and requested he remove his backpack. Feliciano

did not remove his backpack. Officers then approached, manually removed the backpack from Feliciano, and placed handcuffs on him.

Feliciano argues that "delay alone is not the intentional attempt to prevent arrest," citing State v. Hornaday, 105 Wn.2d 120, 713 P.2d 71 (1986).[9] However, in Hornaday, the arrest was unlawful, and the court reasoned that a person illegally arrested may resist the arrest if it is "reasonable and proportioned to the injury attempted upon the party sought to be arrested." Id. at 131. Here, Feliciano does not challenge the legality of the arrest; thus, unlike the defendant in Hornaday, he was not entitled to resist.

Accordingly, when viewed in the light most favorable to the State, any rational fact finder could have found beyond a reasonable doubt that Feliciano intentionally attempted to prevent his arrest.

### III. Prosecutorial Misconduct and Cumulative Error

Feliciano argues that cumulative prosecutorial misconduct entitles him to a new trial. Specifically, he argues that the prosecutor urged the jury to convict Feliciano by inappropriately requesting the jury to "act in the community's best interest," acted as an unsworn witness, vouched for a witness, and denigrated the defense. Feliciano objected to these statements, except for the alleged vouching.

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the

---

[9] In Hornaday, the defendant challenged his conviction for resisting arrest, claiming the arrest itself was unlawful because the arrestable offense was not committed in the presence of the arresting officer. Id. at 121-22. The resisting arrest charge was premised on the defendant's refusal to enter the backseat of the police car and the force required to place him there. Id. at 122. The court agreed the arrest was unlawful and that a person illegally arrested may resist the arrest if it is "reasonable and proportioned to the injury attempted upon the party sought to be arrested." Id. at 131. The record contained no evidence to suggest the defendant used force to resist, "only that he was recalcitrant." Id. Thus, the evidence was "insufficient to establish that the defendant acted unreasonably in resisting arrest." Id.

Washington State Constitution." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). "Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." Id. at 703-04.

If "we find that a prosecuting attorney's statements were improper, we must then determine whether the defendant was prejudiced under one of two standards of review." State v. Allen, 182 Wn.2d 364, 375, 341 P.3d 268 (2015). If the defendant made a timely objection at trial, they must demonstrate the prosecutor's improper conduct " 'resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.' " Id. (quoting State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Id. at 762. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that " 'had a substantial likelihood of affecting the jury verdict.' " Id. at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

A. References to "Community"

"A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking." State v. Ramos, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011) (quoting United States v. Solivan, 937 F.2d 1146, 1153 (6th Cir. 1991)).

13

Here, at the start of closing, the prosecution told jurors their role was to "use your collective judgment to decide what is best for this community." In rebuttal, the prosecution recounted Coser's testimony and had the following exchange with defense counsel:

> [State]: Another thing that [] Coser said in that . . . call was . . . he is punching him, he is stabbing him, and I think he's killing him. That's what he says. It's just like, it could be you, it could be any of you, ladies and gentleman—
>
> [Defense]: Objection, prosecutorial misconduct.

The trial court sustained the objections to each of these remarks and struck "the reference to the community" in the first comment.[10]

The State concedes that the first remark was improper, as it was similar to an argument the court disapproved of in Ramos. 164 Wn. App. at 337 (holding it was improper for the State to argue the defendant "was a part of the drug world, and that the jury should convict in order to protect the community from drug dealing.").

However, even assuming these comments are improper, it is Feliciano's burden to prove that the comments created a substantial likelihood of affecting the verdict. We conclude that he has not met this burden. Feliciano merely argues that "raising plainly improper arguments that demand a defense objection itself prejudices the defense" and

---

[10] Feliciano argues that this second comment was improper because it impermissibly relied on a "golden rule" argument,  which is one that 'urg[es] the jurors to place themselves in the position of one of the parties to the litigation, or to grant a party the recovery they wish themselves if they were in the same position.' " State v. Borboa, 157 Wn.2d 108, 123 n.4, 135 P.3d 469 (2006) (quoting Adkins v. Aluminum Co. of Am., 110 Wn.2d 128, 139, 750 P.2d 1257 (1998)). "Courts find such arguments improper because it encourages jurors to depart from neutrality and decide the case on the basis of personal interest rather than on the evidence." State v. Thach, 126 Wn. App. 297, 317, 106 P.3d 782 (2005), overruled on other grounds by State v. Case, 13 Wn. App. 657, 466 P.3d 799 (2005). But courts have rejected the prohibition of "golden rule" arguments in the criminal context. Borboa, 157 Wn.2d at 124 n.5 ("We are not convinced that the prohibition on 'golden rule' arguments applies in the criminal context and none of the cases cited by [the defendant] support that proposition.").

"forcing counsel to object 'can call further attention to the improper' " comments, without any additional explanation of why, in the context of his case, the comments established prejudice.[11] Furthermore, he contends " '[c]urative instructions have (as judges too rarely acknowledge) only limited efficacy' and may in fact draw jurors' attention to something they might not have noticed."[12] However, it is a well-established presumption that jurors follow the court's instructions. State v. Montgomery, 163 Wn.2d 577, 596, 183 P.3d 267 (2008). Here, the court instructed the jury in its initial instructions to base its decision only on the evidence presented at trial—testimony and exhibits—and that the attorney's arguments were not evidence. Feliciano reiterated this point in his closing argument as well. Consequently, Feliciano does not satisfy his burden to establish that, to the extent the comments were improper, they substantially impacted the fairness of his trial.

B. Acting as Unsworn Witness

Feliciano argues that the prosecution acted as an unsworn witness when he narrated the cellphone video footage of the incident during closing argument. Ordinarily, it is improper for a prosecutor to express a personal opinion concerning the defendant's guilt. State v. McKenzie, 157 Wn.2d 44, 53, 134 P.3d 221 (2006). However, "[i]n the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.' " State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (quoting State v. Gregory, 158 Wn.2d 759, 174 P.3d 1201 (2006)).

---

[11] The appellant's brief quotes State v. Taylor, 18 Wn. App. 2d 568, 582, 490 P.3d 263 (2021).
[12] The appellant's brief quotes Maus v. Baker, 747 F.3d 926, 927-28 (7th Cir. 2014).

Here, the comments were not improper, as the prosecutor did not express their personal opinion concerning the defendant's guilt, but rather drew reasonable inferences from the evidence. In closing argument, the prosecutor played Coffeen's cellphone video for the jury, selected a few still images to pause at and described that the footage proved each element of assault. For example, the prosecutor discussed the video going in and out of focus and connected it to Coffeen's and other witnesses' concerns about the danger of the situation. The prosecutor emphasized that "I want you to focus on . . . what is it that is in the mind of [] Feliciano . . . Was it just to inflict substantial bodily harm . . . or was it to inflict great bodily harm." When reviewing one of the images from the video, the prosecutor noted

> Kelly is up here in the right-hand side. You can see he's on the ground. You can see right where I'm putting this it appears that he has his right arm up. So he is probably, based on testimony we have, in some kind of stupor as to what happened.

> You can see here [] Feliciano. You can see the white sock, and what you can also see is that he is moving toward [] Kelly in the hammock over in this area.

Later, when presenting a final image from the video where Feliciano is walking away from Kelly and there appears to be an unknown object in one of his hands, the prosecutor requested the jury to consider Coser's testimony that he saw the "silhouette of a weapon" when reviewing the footage. Throughout the presentation of the video and images, the prosecutor continued to apologize for its low quality and out-of-focus appearance. Feliciano objected several times during the presentation, arguing "the State is providing the jury [its] own testimony, which is not sworn." The court at one point overruled Feliciano's objection that the prosecutor was misstating the evidence and "remind[ed] the jury of their instructions. The[] [jury] [is] to determine the facts of the

case." The court repeated the instruction again shortly thereafter, overruling another objection to prosecutorial misconduct and "remind[ing] the jury that the parties' comments and arguments are not evidence, the evidence is what you determined has been established." The State continued its argument and again Feliciano objected and then moved for a mistrial given that "there is no way for [the defense] to cross-examine this witness who is testifying to the jury this morning. This is prosecutorial misconduct."

After hearing the parties' arguments, the court opined that the prosecutor's commentary was "very close to the line," given "the way [the State] couched [its] comments on what's being observed" in combination with "multiple comments about the video quality." The court denied the motion, but took steps to "mitigate," including requiring the State to provide "every image" it had displayed and "provide it to [defense counsel]" before his closing argument.

Accordingly, the comments were not improper, as they argued inferences from the evidence rather than expressed the prosecutor's own opinion on Feliciano's guilt. Additionally, Feliciano has not satisfied his burden to show that the comments resulted in prejudice that created a substantial likelihood of affecting the jury verdict. The court gave repeated instructions that closing argument was not considered evidence. Feliciano himself replayed and discussed the video in his own closing argument as well. And during deliberations, the jury was permitted to rewatch the video twice. We conclude there is not a substantial likelihood that the prosecutor's comments describing the video created such prejudice as to deny Feliciano a fair trial.

C. Vouching

Feliciano also argues that the prosecutor "committed misconduct when [the State] vouched for the credibility of its central witness, [] Coser." He highlights when the prosecution described Coser's testimony and stated that "it doesn't really get too much better than that in terms of testimony." Feliciano also notes an instance where the prosecution acknowledges that Coser "readily" admitted he incorrectly described that Kelly was stabbed multiple times during the 911 call. The prosecution then commented "[t]hat's what an honest witness does." Feliciano did not object to these comments.

It is misconduct for a prosecutor to express a personal belief in the veracity of a witness. State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality opinion) (citing United States v. Brooks, 508 F.3d 1205, 1209 (9th Cir. 2007)). " 'Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony.' " State v. Robinson, 189 Wn. App. 877, 892-93, 359 P.3d 874 (2015) (quoting State v. Coleman, 155 Wn. App. 951, 957, 231 P.3d 212 (2010)). However, we will not find prejudicial error "unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." State v. Brett, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting State v. Sargent, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

Here, we conclude the comments were improper as they placed the prestige of the government behind a witness by presenting Coser's inconsistent retelling of the event as the acts of an "honest witness." The State also improperly expressed a personal belief in the veracity of the witness by emphasizing that Coser's testimony "didn't get much better than that." However, Feliciano fails to show that no curative

18

instruction could obviate the error and that the misconduct created a substantial likelihood of affecting the jury verdict. As discussed above, the court provided instructions that comments from the parties were not to be considered evidence and that the jury was the sole judge "of the credibility of each witness" and "the value or weight to be given to the testimony of each witness." The court also verbally instructed the jury on these points twice before the closing argument where these comments were made.

Additionally, although Feliciano indicates that Coser was a "central witness" to the case in which vouching for his veracity created substantial prejudice, Coser's testimony was far from the only evidence of Feliciano's guilt. Indeed, Coffeen also testified to much of the same information, including Feliciano's movements before, during, and after he attacked Kelly and that she believed she saw Feliciano wield a knife during the exchange. Coser's and Coffeen's testimony were additionally corroborated by cellphone footage that captured a portion of the exchange, and two other witnesses, Picard and Carlson, testified to the assault as well. Accordingly, Feliciano fails to meet his burden of demonstrating that any resulting prejudice could not have been cured.

D.  Denigrating or Impugning the Defense

Feliciano contends that the prosecutor denigrated the defense when, at the start of the prosecutor's rebuttal, the prosecutor explained the historical roots of a "red herring." We disagree, as these comments were in response to the defense's closing argument.

A "prosecutor must not impugn the role or integrity of defense counsel." State v. Lindsay, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014). This is so because

"[p]rosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." Id. at 432 (citing Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir. 1983) (per curiam)). Courts have held that statements implying deception and dishonesty, such as referring to the defense's case as "bogus," "a crock," or as " 'involving a sleight of hand,' " are improper. Id. at 433 (quoting State v. Thorgerson, 172 Wn.2d 438, 451-52, 258 P.3d 43 (2011)).

However, "[a] prosecuting attorney's allegedly improper remarks must be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). For instance, it is not improper for a prosecutor to argue that evidence does not support the defense theory. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

During closing argument, defense counsel reiterated that the absence of certain evidence created reasonable doubt, such as the bicycle tire pump Feliciano was holding when contacted by police, possible additional witnesses to the confrontation, the identity of the man wearing all black who stood nearby during the assault, the victim's shirt, and "documentation of a bloody scene." In rebuttal, the prosecution urged the jury not to fall for a "red herring" and recounted that "not so smart dogs went for the red herring." Feliciano objected, but the court overruled the objection. The prosecution proceeded to discuss why the issues raised by defense were not important to deciding the case and did not discuss a "red herring" again.

Feliciano argues that "[t]he prosecutor's story equated the defense argument with something only 'not so smart' jurors would fall for, suggesting the defense was trying to

dupe the jurors and impugning defense counsel's credibility." And describing an argument as a "red herring" could figuratively indicate that the defense's argument is deceptive or dishonest, as a red herring is intended to mislead the jury by directing its attention to something unimportant. However, in the context of the entirety of the argument, the red herring comment cannot be construed as improper due to denigrating the defense. Rather, the prosecutor was arguing to the jury that the defense's focus on portions of missing evidence was unimportant, and that the jury still had sufficient evidence to decide the case regardless. In context, these comments were not so prejudicial that they resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.

### E. Cumulative Error

Lastly, Feliciano argues that the cumulative effect of the instances of misconduct requires reversal. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." Emery, 174 Wn.2d at 766. "However, the doctrine does not apply where the defendant fails to establish how claimed instances of prosecutorial misconduct affected the outcome of the trial or how combined claimed instances affected the outcome of the trial." Thorgerson, 172 Wn.2d at 454.

Here, most of the complained-of conduct was not improper. As for the comments that were improper—one comment referencing community safety and vouching for witness Coser—Feliciano did not meet his burden of showing they were individually prejudicial. Nor does he satisfy his burden to establish how they cumulatively were

prejudicial, i.e., affected the outcomes of his trial. He argues that the allegation of assault "rested largely on the cell phone video," and thus the prosecution's vouching for Coser and emphasizing that the jury "act in the best interest of the community" likely "impacted the jury and require[s] reversal." However, as discussed above, the allegation of assault rested on more than the cell phone footage, such as multiple 911 calls and testimony from other witnesses. Furthermore, the court struck the single improper comment as it related to the community. Accordingly, we conclude there was no cumulative error requiring reversal.

## IV. Scrivener's Error

The judgment and sentence states that Feliciano was convicted of "Assault 2 (Multiple Prongs)." Feliciano argues that this is incorrect because the jury was instructed not on "multiple prongs," but on only one prong: assault with a deadly weapon. The State concedes this point and does "not object to a limited remand for the ministerial purpose of correcting the judgment and sentence." We accept the concession and remand to correct this scrivener's error.

## CONCLUSION

We affirm the convictions but remand to correct the scrivener's error in the judgment and sentence.

_Chung, J._
_____

WE CONCUR:

_Feldman, J._

_Díaz, J._