263 P.3d 1268 (2011)
STATE of Washington, Respondent,
v.
Antonio RAMOS, Appellant.
No. 65213-3-1.
Court of Appeals of Washington, Division 1.
October 17, 2011.
*1269 Nancy P. Collins, Washington Appellate Project, Seattle, WA, for Appellant.
Hilary A. Thomas, Whatcom County Prosecutor's Office, Bellingham, WA, for Respondent.
*1270 SCHINDLER, J.
¶ 1 Antonio Ramos appeals his conviction of unlawful delivery of cocaine. Ramos contends prosecutorial misconduct during cross examination and closing argument violated his constitutional right to a fair trial. Because there is a substantial likelihood that prosecutorial misconduct affected the jury's verdict, we reverse and remand for a new trial.

FACTS
¶ 2 Lance Tatum works as a paid informant for the Northwest Regional Drug Task Force in Whatcom County (Task Force). Tatum receives $100 for each drug transaction he arranges for the Task Force.
¶ 3 Tatum testified that he obtained the telephone number for Antonio Ramos through a mutual friend. Tatum said that he called Ramos several times in order to establish a relationship and they "talked about everything." At some point, Tatum discussed purchasing cocaine with Ramos. Tatum testified that after Ramos agreed to sell him a quarter of an ounce of cocaine for $400, he contacted Task Force Detective Glen Slick.
¶ 4 On March 25, 2009, Tatum called Ramos to arrange a time and place to purchase cocaine. Detective Slick listened to the call. Detective Slick testified that the man Tatum called had a Hispanic accent and identified himself as "Tony." Tatum told Tony that he had $400 and wanted to purchase a quarter of an ounce of cocaine. Tony told Tatum to meet him at the house he was working on located on Noon Road. After Detective Slick instructed Tatum that the meeting had to take place in the parking lot at Sunset Square Shopping Center (Sunset Square), Tatum insisted on meeting Ramos in the parking lot near Round Table Pizza at Sunset Square. There are approximately 40 different businesses and restaurants at Sunset Square, including Round Table Pizza, the Cost Cutter grocery store, Rite Aid, and Kmart, as well as a movie theater and a bank.
¶ 5 Detective Slick testified that before Tatum called Tony, the Task Force had made arrangements for police surveillance and videotaping the drug transaction in the parking lot near Round Table Pizza.
[Prosecutor:] At the time you had that conversation had you a site planned for the control buy?
[Detective Slick:] Yes. We wanted to do it out there in the Cost Cutter, Rite Aid, Round Table Pizza parking lot complex. It's a good open parking lot and it's part of being a control purchase, it's a location we picked so we can surveil it.
Detective Slick also testified that the Task Force planned to use Tatum after March 25 to arrange additional drug transactions with Tony.
The plan was to further the case, do a second control purchase followed by a third, possibly a fourth. Ultimately, after conducting a series of control purchases, make either a probable cause arrest or establish where he is residing and possibly do a search warrant if we could locate a house or additional information.
¶ 6 At around noon on March 25, Tatum parked his green Ford Escort in the parking lot near Round Table Pizza and the Cost Cutter grocery store. Twenty or 30 minutes later, a man driving a blue van parked next to the Ford Escort. Detective Brent Hanger videotaped Tatum getting into and out of the van. The police officers could not see the facial features of the man inside the van. Tatum testified that he gave the man, he later identified as Ramos, $400 in prerecorded cash for a quarter of an ounce of cocaine. A couple of minutes later, Tatum got out of the van and drove to another location in the Sunset Square complex to meet Detective Slick. Tatum gave Detective Slick the cocaine he had purchased. Detective Slick paid Tatum $100.
¶ 7 Meanwhile, the police videotaped Ramos going into the Cost Cutter grocery store. As Ramos was walking into the grocery store, he greeted a man and a woman standing outside. Approximately 15 minutes later, Ramos came out of the grocery store, got into the van, and drove away.
¶ 8 After March 25, Tatum was unable to contact Ramos. On July 31, the State *1271 charged Ramos with one count of unlawful delivery of cocaine in violation of RCW 69.50.401(2)(A). Ramos entered a plea of not guilty.
¶ 9 Tatum, Detective Slick, and the other Task Force members who participated in the controlled drug transaction at Sunset Square on March 25 testified at trial. Tatum identified Ramos as the person who sold him cocaine on March 25. Tatum conceded he had been previously convicted for theft.
¶ 10 The court admitted the videotapes into evidence and the State played the videotapes for the jury. The first video clip shows Tatum getting into the van and getting out of the van. The glare from the sun and a red truck block the view of the man in the van. However, Detective Colin Bertrand testified that he recognized Ramos and was certain that he was in the van with Tatum. The second video clip shows Ramos walking out of the Cost Cutter grocery store and getting into the blue van. Officer Hanger testified that he recognized the man and woman Ramos talked to outside the grocery store from "an investigation."
¶ 11 Detective Slick testified that he did not determine who owned the blue van. Detective Slick also conceded that the police did not investigate the cell number Tatum used to call Ramos, or whether Ramos used prerecorded buy money to pay for the food he purchased at the Cost Cutter grocery store.
¶ 12 Ramos testified. Ramos said that on March 25, he was working at a house located on Noon Road. Ramos said that he had done stucco work for 30 years and earns between $60,000 and $70,000 a year. Ramos admitted using drugs but denied selling drugs to Tatum.
¶ 13 Ramos said that he made arrangements the day before to have his friend Dave pick him up at the house on Noon Road and drive him to the Cost Cutter grocery store at Sunset Square to get lunch. Ramos is Hispanic and approximately 50-years-old with a beard and long, black hair. Ramos described Dave as approximately 32-years-old with long, black hair and a beard.
¶ 14 Ramos testified that after Dave dropped him off at the Cost Cutter grocery store, he went inside to buy lunch. Ramos said that when he returned, the van was in the parking lot, Dave was not in the van, but the keys were in the ignition. Ramos assumed Dave had gone to a nearby pub in Sunset Square. Ramos testified that he drove the van to the pub to pick up Dave, and then Dave drove him back to work at the house on Noon Road.
¶ 15 During cross examination, the prosecutor asked Ramos how much money he earned in 2008. In response, Ramos admitted that he was in prison in 2008 "for drugs" and was jail in 2007 for possession of hydrocodone. Ramos also admitted meeting Dave while incarcerated at the Whatcom County Jail. The prosecutor asked Ramos a number of questions about the drug history of the man and the woman he talked to outside the Cost Cutter grocery store. Over repeated objections, the prosecutor also asked Ramos whether people who use drugs "sometimes sell drugs ... to support their habit."
¶ 16 At the beginning of closing argument, the prosecutor urged the jury to act on behalf of the community and stop Ramos from continuing to sell cocaine at Sunset Square. During closing, the defense argued that the police did not include key details testified to at trial in the written reports, that the police did not investigate who owned the van, and did not determine whether prerecorded buy money was used by Ramos to purchase lunch at Cost Cutter. The jury found Ramos guilty of delivery of cocaine on March 25. The court imposed a standard range sentence. As part of the judgment and sentence, the court ordered Ramos to pay legal financial obligations of $5,550.[1]

ANALYSIS
¶ 17 Ramos argues prosecutorial misconduct during cross examination and in closing argument denied him the right to a *1272 fair trial. A prosecutor owes a defendant a duty to ensure the right to a fair trial is not violated. State v. Monday, 171 Wash.2d 667, 676, 257 P.3d 551 (2011). We review a claim of prosecutorial misconduct for abuse of discretion State v. Ish, 170 Wash.2d 189, 195, 241 P.3d 389 (2010).
¶ 18 To prevail on a claim of prosecutorial misconduct, Ramos must establish that the conduct was both improper and prejudicial. State v. Fisher, 165 Wash.2d 727, 747, 202 P.3d 937 (2009). Prosecutorial misconduct is prejudicial where there is a substantial likelihood the improper conduct affected the jury's verdict. State v. Yates, 161 Wash.2d 714, 774, 168 P.3d 359 (2007).
¶ 19 Where the defense fails to object or to request a curative instruction, the error is waived unless the conduct is "`so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice'" that could not have been neutralized by a curative instruction to the jury. Fisher, 165 Wash.2d at 747, 202 P.3d 937 (internal quotation marks omitted) (quoting State v. Gregory, 158 Wash.2d 759, 858, 147 P.3d 1201 (2006)).
¶ 20 A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on the credibility of the witnesses based on the evidence. State v. Stenson, 132 Wash.2d 668, 727, 940 P.2d 1239 (1997). Improper remarks by the prosecutor are not grounds for reversal if invited or provoked by defense counsel "unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." State v. Russell, 125 Wash.2d 24, 86, 882 P.2d 747 (1994).

Cross Examination
¶ 21 Ramos contends that the prosecutor improperly asked him on cross examination whether Tatum had a motive to lie. The State concedes some of the questions improperly called for speculation, but argues that the question about whether Tatum had a motive to lie was not improper.
¶ 22 It is prosecutorial misconduct to ask a witness whether another witness is lying. State v. Wright, 76 Wash.App. 811, 821, 888 P.2d 1214 (1995); State v. Casteneda-Perez, 61 Wash.App. 354, 362-63, 810 P.2d 74 (1991). Requiring a defendant to testify about whether a witness is lying is prejudicial. Wright, 76 Wash.App. at 822, 888 P.2d 1214. However, a prosecutor does not commit misconduct by asking a witness whether another witness was mistaken. Such questions "do not have the same potential to prejudice the defendant or show him or her in a bad light." Wright, 76 Wash.App. at 822, 888 P.2d 1214.
¶ 23 The prosecutor asked Ramos if Tatum had any reason to dislike him. In response, Ramos denied knowing Tatum. The prosecutor then asked Ramos if Tatum had any reason "to make up anything untrue about you." Defense counsel objected to the question as calling for speculation. The court sustained the objection. The prosecutor then asked Ramos if he could "think of any reason [Tatum] might be making up something untrue about you?" Defense counsel did not object.
¶ 24 The State cites State v. Graham, 59 Wash.App. 418, 798 P.2d 314 (1990) to argue that the prosecutor did not commit misconduct by asking Ramos whether he knew if Tatum "might be making up something untrue." In Graham, the trial court allowed the prosecutor to ask the defendant whether he knew of any reason why the complaining witness would lie. On appeal, we held that while the question was improper, it was not flagrant and ill-intentioned misconduct and, if objected to, could have been addressed with a curative instruction. Graham, 59 Wash.App. at 427, 429, 798 P.2d 314. Likewise, asking Ramos whether Tatum had a motive to testify untruthfully was improper but, standing alone, it was not so flagrant and ill-intentioned that an instruction to the jury could not have cured any prejudice.[2]
*1273 ¶ 25 Ramos also contends that the prosecutor committed misconduct by asking him about the drug history of the man and the woman he spoke to before going into the Cost Cutter grocery store. The prosecutor asked Ramos whether he knew Rachel Lebec and Aaron Salsbury "from the drug world." Despite objections to this line of questioning, the prosecutor continued to ask Ramos about the drug history of Lebec and Salsbury.
Q Now, you met some people outside the Cost Cutter store which you knew?
A No, I didn't meet anybody.
Q You didn't meet Rachel Lebec outside Cost Cutter as you walked in?
A I said hi to a couple people but I didn't know who they are.
Q You didn't know who they are?
A Not by name.
Q Rachel Lebec was one of those persons?
A Yeah. I don't know her as Rachel.
Q Do you just know her from the drug world?
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled.
Q (By [the prosecutor]) Did you recognize her from the drug world?
A I don't know. I don't know.
Q Do you know if Rachel Lebec has a serious drug problem?
A I have no idea.
[DEFENSE COUNSEL]: Objection, speculation.
THE COURT: Sustained.
Q (By [the prosecutor]) Do you know she's in drug court right now?
[DEFENSE COUNSEL]: Objection.
THE COURT: Sustained.
Q (By [the prosecutor]) The other person was Aaron Salsbury; do you recognize that name?
A No.
Q Do you know him from the drug world?
A No.
Q You know he has convictions?
[DEFENSE COUNSEL]: Objection.
THE COURT: Sustained.
[DEFENSE COUNSEL]: Move that all those be stricken.
THE COURT: I will strike the last answer.
¶ 26 The State concedes that "it was error to attempt to cross examine Ramos about his acquaintances' drug problems and convictions." However, the State asserts that Ramos cannot establish prejudice. We accept the State's concession that the prosecutor's questions about the drug history of Lebec and Salsbury were improper. While, standing alone, Ramos may not be able to establish prejudice, when coupled with the prosecutor's improper arguments in closing, we conclude there is a substantial likelihood the misconduct affected the jury verdict.

Closing Argument
¶ 27 Ramos asserts the prosecutor committed misconduct in closing argument by improperly appealing to the passion and prejudice of the jury by arguing that he was a part of the drug world, and that the jury should convict in order to protect the community from drug dealing at Sunset Square. The State concedes the prosecutor impermissibly argued that the jury should convict Ramos in order to eliminate the drug dealing at Sunset Square. But the State asserts that Ramos cannot show prosecutorial misconduct affected the jury verdict. We disagree.
¶ 28 At the very beginning of closing argument, the prosecutor asked the jury to convict Ramos in order to prevent "the coke dealers" from engaging in "drug activity" at Sunset Square.
Good afternoon, ladies and gentlemen. You now have all the evidence that you're going to be receiving in this case. As I said in my opening statement, this evidence shows that Antonio Ramos is guilty beyond a reasonable doubt of the crime of *1274 delivery of a controlled substance and I'm going to ask you to return that verdict based upon the evidence that has been submitted.
Again, this crime occurred March 25th of 2009, shortly before noon at the Sunset Square parking lot off of Sunset Drive, Bellingham, Whatcom County, Washington. In the course of this trial you probably learned things about drug activity in the community that you had no idea was going on. You have actually seen videotape of drug activity in this community. Most of you had no idea what is going on and probably wish you didn't know it was going on. But the events that are depicted in the video you saw this morning of March 25th of 2009 is why the detectives were out there at that parking lot on that date to investigate drug crimes. This is also why we are here today, so people can go out there and buy some groceries at the Cost Cutter or go to a movie at the Sunset Square and not have to wade past the coke dealers in the parking lot. That's why they were there, that's why you're here, and that's why I'm here, to stop Mr. Ramos from continuing that line of activities. That's what the case is about and that's what the truth of this case is about and that's why this is a serious case.
¶ 29 In United States v. Solivan, 937 F.2d 1146, 1153 (6th Cir.1991), the court held that a prosecutor engages in misconduct by arguing that the jury should convict in order to protect the community, deter future law-breaking, or other reasons unrelated to the charged crime.[3]
A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.
Solivan, 937 F.2d at 1153 (internal quotation marks omitted).
¶ 30 In Solivan, the prosecutor argued:
What you're listening to is a wholesale distributor of narcotics, cocaine discuss her business affairs and complain about her busy schedule, the lack of good product and the trouble she's having getting this stuff up here now. And I'd submit to you, folks, that she's been caught now. And I'm asking you to tell her and all of the other drug dealers like her(defense counsel's objection and Court's response omitted)[t]hat we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky and....
Solivan, 937 F.2d at 1148 (internal quotation marks and italics omitted) (alteration in original). The court held that the defendant's constitutional right to a fair trial was violated by the prosecutor's improper appeal "to the community conscience in the context of the War on Drugs."
Here, defendant's constitutional right to a fair trial was violated because the appeal to the community conscience in the context of the War on Drugs prejudicially impacted on her. The fear surrounding the War on Drugs undoubtedly influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision finding defendant guilty or innocent of the crimes with which she was charged. The substance of the statements made by the prosecutor in this case were designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jurors' emotions regarding the War on Drugs by urging them to send a message and strike a blow to the drug problem.
This nation faces a variety of social problems with which all citizens are daily confronted. The drug problem is one of the most compelling and devastating problems *1275 faced by this nation today. This Court is acutely aware of the nature and extent of the drug problem. However, government prosecutors are not at liberty to urge jurors to convict defendants as blows to the drug problem faced by society or specifically, within their communities, or to send messages to all drug dealers. Such appeals are extremely prejudicial and harmful to the constitutional right to a fair trial. It should be clear from the foregoing discussion that, while not causing error per se unless the statements are deemed to be calculated to incite prejudice, prosecutors should exercise extreme caution when making any statement referring to the community interests of jurors.
Solivan, 937 F.2d at 1153-54.
¶ 31 Although the trial court in Solivan instructed the jury to disregard the improper argument, the court reversed because the "admonition to the jury did not neutralize the prejudice resulting from such comments." Solivan, 937 F.2d at 1157.
¶ 32 The State relies on a case that distinguishes Solivan in an effort to argue Ramos cannot establish prejudice. In United States v. Wettstain, 618 F.3d 577 (6th Cir.2010), the court held that the prosecutor's appeal to community conscience during closing argument was not prejudicial because it was an isolated instance of misconduct, and the evidence at trial showed that the defendants had sold drugs in the community for at least ten years. Wettstain, 618 F.3d at 588-90. The court held that "an immediate, strong, and proper curative instruction" was sufficient to prevent prejudice. Wettstain, 618 F.3d at 590.
¶ 33 Here, unlike in Wettstain, the prosecutor's argument was not based on the evidence and was not isolated. Ramos was charged with one count of delivery of cocaine. There was no evidence that Ramos was "continuing" to engage in drug activity or drug dealing at Sunset Square. To the contrary, the evidence established that the Task Force insisted that the drug transaction Tatum arranged with Tony take place at Sunset Square. Rather than an isolated instance of misconduct, the prosecutor's improper comments were made at the beginning of closing argument as a prism through which the jury should view the evidence. The prosecutor argued that "the case is about" preventing Ramos from continuing to engage in drug dealing at Sunset Square "so people can go out there and buy some groceries at the Cost Cutter or go to a movie at the Sunset Square and not have to wade past the coke dealers in the parking lot." As in Solivan, we conclude that an instruction could not have cured the prejudicial effect of the prosecutor's improper and intentional appeal to convict Ramos based on an irrelevant and prejudicial argument.
¶ 34 We also conclude the prosecutor improperly argued that because Ramos knew Lebec and Salsbury, he was part of the "drug world" and drug business. The prosecutor argued:
Mr. Ramos acknowledges that he ran into two people on the way to the store. He wouldn't say their names but Detective Hanger knows who they are. He knows that they were Rachel Lebec and Aaron Salsbury, two people that he had opened investigations upon and he recognized them and knew exactly who they were.
Contrary to the prosecutor's argument, the testimony did not establish that Lebec and Salsbury were the targets of a drug task force investigation. While a prosecutor has "some latitude to argue facts and inferences from the evidence," a prosecutor is not "permitted to make prejudicial statements unsupported by the record." State v. Jones, 144 Wash.App. 284, 293, 183 P.3d 307 (2008) (citing State v. Weber, 159 Wash.2d 252, 276, 149 P.3d 646 (2006)); see also Miller v. Pate, 386 U.S. 1, 6-7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (holding that a prosecutor commits misconduct by misrepresenting the facts in the record).[4]

*1276 CONCLUSION
¶ 35 Although the evidence against Ramos was strong, we hold there is a substantial likelihood that prosecutorial misconduct on cross examination and in closing argument impermissibly affected the jury's verdict. We reverse Ramos's conviction for unlawful delivery of a controlled substance and remand for a new trial.
WE CONCUR: LEACH, A.C.J., and BECKER, J.
NOTES
[1] Because we reverse, we need not address whether the trial court erred by requiring Ramos to pay legal financial obligations of $5,550.
[2] The prosecutor also asked Ramos why he was the only one seen near the van in a parking lot "crawling with police officers." Contrary to the argument on appeal, the question does not ask Ramos to comment on whether the police were lying. Ramos also argues that questions about his ethnicity and prior convictions were improper. But Tatum and Detective Slick testified that "Tony" had a "Hispanic accent," and Ramos testified that he earned $60,000-$70,000 each year. Ramos also admitted using but not selling drugs. The questions about his income that he earned that elicited his admission as to prior drug convictions were not improper.
[3] In Perez-Mejia, we also held that "a prosecutor engages in misconduct when making an argument that appeals to jurors' fear and repudiation of criminal groups." State v. Perez-Mejia, 134 Wash.App. 907, 916, 143 P.3d 838 (2006).
[4] Ramos also contends that the prosecutor committed misconduct during rebuttal argument by vouching for the credibility of the police officers. The State argues that the argument was a permissible response to the defense closing argument. We disagree. It is misconduct for a prosecutor to vouch for a witness by expressing his or her personal belief as to the truthfulness of a witness. Ish, 170 Wash.2d at 196, 241 P.3d 389. "`It is misconduct for a prosecutor to state a personal belief as to the credibility of a witness.'" Ish, 170 Wash.2d at 196, 241 P.3d 389 (quoting State v. Warren, 165 Wash.2d 17, 30, 195 P.3d 940 (2008)). The prosecutor argued that "the truth of the matter is [the police witnesses] were just telling you what they saw and they are not being anything less than 100 percent candid." While Ramos timely objected, the trial court overruled the objection. We conclude the prosecutor improperly vouched for the credibility of the police witnesses.