IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86443-2-I |
| Respondent, | |
| v. | DIVISION ONE |
| FRANKIE ROBERTSON-BUTLER, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — Frankie Robertson[1] challenges his convictions for assault in the second degree, drive-by shooting, and unlawful possession of a firearm in the first degree. He argues he received ineffective assistance because his counsel failed to request a necessity instruction as it relates to the unlawful possession conviction and an "act on appearances" instruction as it related to his self-defense theory. He also requests this court remand for further factfinding regarding additional ineffective assistance claims. Additionally, he claims the State engaged in prosecutorial misconduct during opening and closing argument and that his counsel's failure to object to the statements constituted ineffective assistance. Finally, Robertson-Butler challenges community custody conditions that impose geographic boundaries and require a mental health evaluation and prescribed treatment. Finding no error, we affirm.

---

[1] We refer to Appellant as Robertson, as that is the name used in his appellate briefing and his preference as stated at trial.

BACKGROUND

On September 7, 2021, Robertson was sitting in the back seat of Lamonte Stewart's red Kia as they pulled into a Chevron gas station in Renton. Robertson had a Glock .40 caliber handgun with an extended magazine on his lap when they drove up to the gas station. At trial, Robertson testified that it was his practice to have the gun on him for safety because of the type of community he lived in and "the kind of stuff" he was exposed to.

Video surveillance footage from Chevron showed that at 4:46 p.m., the red Kia pulled into the gas station and stopped at the #11 gas pump. Other vehicles and customers were present at the gas station, and there was traffic on the streets. A female exited the Kia and went to pump gas. A male in a white tank top, later identified as Robertson, exited the Kia from the rear passenger seat and stood outside the vehicle. Robertson then made a waving motion with his hand, apparently toward something beyond the scope of the video and fired a handgun in that direction. Bystanders ducked for cover. A nearby vehicle in the same parking lot sustained gunfire. Robertson got back into the Kia, and it drove off.

Aubrey Rogers, a bystander to the incident, saw bullets ricocheting off the ground. Isael Valencia, a person working at the adjoining carwash, heard shots and saw a Black man in a white tank top shooting a gun near the open door of a red car. Valencia testified the firing was continuous, and he did not see anyone else with a gun or returning fire. Similarly, another bystander, Dawnelle Junell, did not see who was firing or where the gunshots were coming from but confirmed the firing was continuous.

2

Leann Whitney, a Renton Police Department patrol officer, was near the gas station when the incident took place, and, upon hearing gunshots, crouched down in her driver's seat. While crouched, she attempted to peek out of the window to her left after noticing a pause in the gunfire. She saw a few women "on the ground . . . screaming and yelling at [her] to come to them. But then the gunfire started again." Whitney reported the incident on the police radio. She then drove into the Chevron parking lot, where witnesses directed her toward a red car that was driving off.

Police pursued the car for about one mile, at which point it came to a stop. The police apprehended Robertson and the other occupants of the vehicle without incident. There was a Glock .40 caliber handgun with an extended magazine on the rear floorboard. Police recovered approximately 15 .40 caliber shell casings of two different brands from the gas station.

The State charged Robertson with drive-by shooting, assault in the second degree, and unlawful possession of a firearm in the first degree. At trial, Robertson testified in his own defense. He testified that as the Kia pulled next to the gas pump, he noted another red car backing out from the store. There was a man sitting in the driver's seat while a woman was in the passenger's seat. Robertson recounted that the driver had an "unfriendly" look and was staring at him and the other passengers in his car. He testified that he did not know the driver and had not seen him before. As the other car was pulling away, Robertson testified that he noticed that the driver was reaching for something and that "it didn't look right." Robertson testified that as the red car passed the gas pump "real slow" and through Robertsons blind spot, to him, these actions indicated "Danger. That he has a gun. It's like indications of a gun." Robertson also

3

noted that when the car passed him, the driver rolled his window down, indicating to him that the driver "could possibly shoot." While watching some of the video footage, Robertson testified that he was attempting to defuse the situation when he started waving at the man.

As the red car was rolling away, Robertson testified he saw the driver turn and brandish a gun in his direction. According to Robertson, he then began shooting and shot about 7-10 times. He testified that the driver returned fire and eventually left. Robertson then got back in the car and took off in fear the other car would return. He testified that in firing on this other car, he did what he had to do because he "couldn't run. [He] couldn't go forward toward [the driver]. [He] couldn't back up." Robertson also discussed that past traumatic events led him to believe that "[o]ne of us woulda been shot " if he had not fired at the driver.

At trial, Robertson stipulated to having previously been convicted of a serious offense in 2013. For the drive-by shooting and assault charges, the court provided jury instructions on self-defense. The jury returned guilty verdicts on all counts: count 1, drive-by shooting in the first degree; count 2, assault in the second degree with an additional firearm enhancement finding, and count 3, unlawful possession of a firearm in the first degree.

In his presentencing report, Robertson requested the court impose a mental health sentencing alternative (MHSA), referencing his post-traumatic stress disorder (PTSD) diagnoses, or, in the alternative, an exceptional downward sentence. The court declined to impose a MHSA, as it lacked sufficient information to make that determination. Instead, the court imposed an exceptional sentence downward of 41

4

months for counts 1-3 to run concurrently and an additional 36 months in association with the firearm enhancement finding, resulting in 77 months of total confinement. The court also imposed 18 months of community custody for counts 1 and 2 respectively, with attendant conditions. Robertson timely appeals.

## DISCUSSION

Robertson challenges his convictions on several grounds, including ineffective assistance of counsel (IAC) and prosecutorial misconduct. He also challenges the community custody conditions that impose geographic boundaries and require a mental health evaluation and prescribed treatment without an underlying finding that Robertson is a "mentally ill person as defined by RCW 71.24.025." We address each in turn.

### I. Counsel's Failure to Request Jury Instructions

Robertson argues that he received ineffective assistance because his counsel failed "to request instruction on an available affirmative defense," notably the defense of necessity for the unlawful possession of a firearm and an "act on appearances" instruction in support of his self-defense claim for the drive-by shooting and assault charges.[2] The State counters that "Robertson-Butler was not entitled to the necessity defense, because he illegally possessed his gun long before the circumstances arose that allegedly caused the need to use it." As for the "act on appearances" instruction, the State argues the instruction was not required because it "included largely the same underlying principles as the general self-defense instruction." We conclude that because Robertson was not entitled to a necessity instruction and cannot show prejudice in

---

[2] Robertson refers to the instruction that support's his self-defense claim for counts 1 and 2 as "act on appearances."

relation to the "act on appearances" instruction, he fails to establish that his counsel provided ineffective assistance.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). For a successful claim of IAC, a defendant must establish both objectively deficient performance and resulting prejudice. State v. Emery, 174 Wn.2d 741, 754-55, 278 P.3d 653 (2012). To show deficient performance, the defendant must show that counsel's representation fell below an objective standard of reasonableness in light of all the circumstances. Strickland v. Washington, 466 U.S. 668, 688 (1984). "Courts engage in a strong presumption counsel's representation was effective." State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Prejudice requires that "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 334-35. The court need not consider both deficiency and prejudice if a petitioner fails to prove one. In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012). We review ineffective assistance of counsel claims de novo. State v. Azevedo, 31 Wn. App. 2d 70, 81, 547 P.3d 287 (2024).

"Where the claim for ineffective assistance is based on counsel's failure to request a particular jury instruction, the defendant must show (1) they were entitled to the instruction, (2) counsel's performance was deficient in failing to request it, and (3) the failure to request the instruction caused prejudice." Id. at 82.

A. Failure to Request "Necessity" Instruction

In certain circumstances, a necessity instruction can be a defense to the crime of unlawful possession of a firearm. State v. Jeffrey, 77 Wn. App. 222, 226, 889 P.2d 956 (1995). A defendant who asserts a necessity defense must establish by a preponderance of the evidence that (1) they "reasonably believed [they] or another was under unlawful and present threat of death or serious bodily injury," (2) they "did not recklessly place [themselves] in a situation where [they] would be forced to engage in criminal conduct," (3) "the Defendant had no reasonable legal alternative," and (4) "there was a direct causal relationship between the criminal action and the avoidance of the threatened harm." Id. at 224 (internal quotation marks omitted) (quoting U.S. v. Lemon, 824 F.2d 763 (9th Cir. 1987)). In determining whether the defendant offered sufficient evidence to merit a necessity defense, "we interpret the evidence most strongly in favor of the defendant and must not weigh the evidence, which is an exclusive function of the jury." State v. Spokane County Dist. Ct., 198 Wn.2d 1, 12, 491 P.3d 119 (2021).

Necessity instructions are not merited when the defendant was in possession of a firearm before the "unlawful and present threat of death or serious bodily injury" arose. State v. Parker, 127 Wn. App. 352, 355, 110 P.3d 1152 (2005). For example, in Parker, the defendant testified that he carried a gun on him because he had been shot the previous year and his assailants were still at large. Id. at 354. The trial court properly rejected a proposed necessity instruction because the defendant "did not show that he reasonably believed he was under an unlawful and present threat of death or serious bodily injury" the moment he "purchased and possessed the gun." Id. at 355.

7

Furthermore, the defendant "failed to establish a direct causal relationship between his possession of a firearm and the avoidance of the threatened harm." Id. at 356. Although possession of a firearm perhaps made an attack less attractive, "it did not eliminate the possibility of attacks by his assailants." Id. Likewise, in Jeffrey, the court held the defendant was not entitled to a necessity instruction because he possessed the gun before someone was allegedly lurking outside his home, and no evidence showed the alleged lurker was "capable of immediately entering the home" or in any way posed an imminent threat. 77 Wn. App. at 227. Cf. State v. Stockton, 91 Wn. App. 35, 37-8, 955 P.2d 805 (1998) (necessity instruction was proper where defendant grabbed his assailant's gun while being beaten, pointed it at his attackers, and ran away).

We conclude Robertson was not entitled to the necessity instruction. As in Parker and Jeffrey, there was no evidence that Robertson experienced a present threat of death or serious bodily injury from the moment he was in possession of the gun. Rather, he testified that he generally carried his .40 caliber pistol for his safety given past experiences and arrived at the Chevron with it in his lap. Robertson experienced concern for his safety only after he noticed the other driver. As in Parker, here, although possession of the firearm could make an attack less attractive, "it did not eliminate the possibility of attacks." 127 Wn. App. at 356. The evidence did not support a direct causal relationship between Robertson's possession of the firearm and avoiding the threatened harm, so it did not support a necessity instruction. Counsel was not deficient for failing to request an instruction to which he was not entitled.

We also reject Robertson's argument that the State "elected" that the possession charge was predicated on his stepping out of the car,[3] at which point he experienced a present threat of death or serious bodily injury.[4] The "election" principle does not apply here. Unlawful possession of a firearm "is a 'course of conduct' rather than a discrete act because that behavior takes place over a period of time rather than at one distinct moment.' " State v. Kenyon, 150 Wn. App. 826, 834, 208 P.3d 1291 (2009) (quoting State v. McReynolds, 117 Wn. App. 309, 338, 71 P.3d 663 (2003)). No election is needed if the State presents evidence of a continuing course of conduct. State v. Locke, 175 Wn. App. 779, 803, 307 P.3d 77 1 (2013). Here, the State did not elect any discrete act of possession. Rather, the jury was properly instructed to consider the entire course of conduct and that to find Robertson guilty, it needed to determine that "on or about September 7, 2021, the defendant knowingly had a firearm in his possession or control."

As Robertson was not entitled to a necessity instruction, he cannot establish that his counsel was deficient for failing to request such an instruction. As a result, his claim of ineffective assistance on this basis fails.

---

[3] He cites to the following portion of the State's closing argument:

> Okay, this is what we call the to-convict instruction. And, obviously, as you know, the defendant has already admitted that he had a gun in his possession on the day in question. And even though Mr. Robertson told you that he was carrying it, you know, actually prior to getting to the Chevron, the "possession" that the State is asking you to focus on for purposes of this charge, is the act of Mr. Robertson wielding that gun in his hand when he stepped out of the car at the gas station.

[4] Robertson cites to In re Matter of Knight for the contention that when the State clearly identifies for the jury a particular act on which the charges are based, the election is sufficient. 196 Wn.2d 330, 340, 473 P.3d 663 (2020). However, Knight concerned multiple, distinct acts that could have satisfied two robbery charges. Id. at 334, 340. Robertson does not cite authority that involved a continuous course of conduct crime.

B.  Failure to Request "Act on Appearances" Instruction

In relation to the drive-by shooting and assault charges, Robertson's counsel proposed, and the court gave, the standard instruction on self-defense,[5] the definition of "necessary,"[6] and the "no duty to retreat" instruction.[7] However, his counsel did not request an "act on appearances" instruction, which states

> A person is entitled to act on appearances in defending [himself] [herself] [another], if [he] [she] believes in good faith and on reasonable grounds that [he] [she] [another] is in actual danger of injury, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

---

[5] The court provided the jury with this instruction on self-defense:

> It is a defense to the charges of Drive-By Shooting and Assault in the Second Degree, as charged in Counts 1 and 2, that the force used was lawful as defined in this instruction.
> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.
> The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.
> The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 17.02, at 282 (5th ed. 2021) (WPIC).

[6] The court instructed the jury that "[n]ecessary means that, under the circumstances as they reasonably appeared to the actor at the time, (1) no reasonably effective alternative to the use of force appeared to exist and (2) the amount of force used was reasonable to effect the lawful purpose intended." See WPIC 16.05, at 272.

[7] The court provided the jury this "no duty to retreat" instruction:

> It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force.
> Notwithstanding the requirement that lawful force be "not more than is necessary," the law does not impose a duty to retreat. Retreat should not be considered by you as a "reasonably effective alternative."

See WPIC 17.05, at 294.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 17.04, at 292 (5th ed. 2021) (WPIC). Robertson claims his counsel's failure to request the instruction constituted ineffective assistance. We disagree.

Again, to demonstrate deficient performance for failing to request the "act on appearances" instruction, Robertson must show he was entitled to the instruction. "To be entitled to a particular instruction, the defense must show that a jury instruction accurately states the law and that it is justified by evidence in the case." State v. Moreno, 26 Wn. App. 2d 681, 692, 529 P.3d 431 (2023). The parties dispute only whether the instruction was justified by the evidence in the case.

According to Robertson, a person in the parking lot appeared to be staring at him and his friends in an unfriendly manner. Attempting to defuse the situation, he testified that he waved the person off, which was corroborated by video footage. He testified that he did not fire his gun until the other person rolled down his window and pointed a gun at him. Even if other evidence indicated Robertson could have been mistaken as to the extent of the danger—he was not struck by any bullets, and other witnesses either did not testify as to where the bullets were coming from or affirmatively stated they saw only Robertson firing his gun—the record supported a plausible defense theory that he believed in good faith and on reasonable grounds that he or another was in actual danger of injury.

Failing to ask for an instruction is not necessarily deficient "if it can be explained by 'legitimate trial strategy or tactics.' " Moreno, 26 Wn. App. 2d at 694-95 (quoting State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)). The State argues that counsel could have determined that it "was not factually compelling in their case" to

seek an "act on appearances" instruction because it "would have informed the jury that Robertson could defend himself only if he believed in *good faith* and on *reasonable grounds* that he was in actual danger, even it turned out he was mistaken." The State continues arguing that given the "extreme facts of this case, the instruction could have had the opposite of its intended effect." But given his theory of self-defense, Robertson's actions and testimony that he was "extreme[ly] fearful" and "terrified," could also show he believed in good faith and on reasonable grounds that he was about to be harmed. Thus, there was no strategic or tactical reason not to seek the "act on appearances" instruction.

But even assuming counsel's failure to request the instruction constituted deficient performance, Robertson cannot show prejudice, as he must do to demonstrate a constitutional claim of ineffective assistance. Ordinarily, "self-defense instructions are subject to heightened appellate scrutiny." State v. Woods, 138 Wn. App. 191, 196, 156 P.3d 309 (2007). The instructions " 'must more than adequately convey the law.' " Kyllo, 166 Wn.2d at 864 (quoting State v. Walden, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997)). Instead, the "instructions, read as a whole, 'must make the relevant legal standard manifestly apparent to the average juror.' " Kyllo, 166 Wn.2d at 864 (quoting Walden, 131 Wn.2d at 473). It is not necessarily error to fail to provide a WPIC 17.04 instruction "when under the self-defense instruction given, counsel is free to argue that the defendant's 'reasonable belief that he was in danger could properly be a mistaken belief.' " State v. Kidd, 57 Wn. App. 95, 99, 786 P.2d 847 (1990) (quoting State v. Bius, 23 Wn. App. 807, 810, 599 P.2d 16 (1979)).

Here, the court provided an instruction that specified that

> [t]he use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.
> The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

See WPIC 17.02, at 282. In closing, Robertson's counsel argued the Robertson "was in extreme fear" when "he saw a gun," so his response was proportional to this concern. Thus, the jurors were aware they had to assess what danger meant from Robertson's perspective. The trial court also provided the jury a definition of "necessary" that emphasized they had to consider the "circumstances as they reasonably appeared to [Robertson] at the time" and that the "amount of force used was reasonable." See WPIC 16.05, at 272. Because the other instructions more than adequately conveyed the law to the average juror, Robertson was not prejudiced by a lack of the "act on appearances" instruction. We conclude that Robertson fails to meet the burden of demonstrating that he received ineffective assistance of counsel.

C.  Remand for Evidentiary Hearing

Robertson requests this court remand for an evidentiary hearing concerning additional IAC claims. We reject the request.

RAP 9.11 addresses when it is appropriate to direct additional evidence on review be taken:

> (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy

13

> available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

RAP 9.11(a). Additionally, RAP 12.2 generally allows the appellate court to "take any other action as the merits of the case and the interest of justice may require." The party requesting additional evidence under RAP 9.11 must address all six of the rule's requirements. See State v. Fuentes, 179 Wn.2d 808, 826-27, 318 P.3d 257 (2014) (holding court of appeals was correct to strike additional evidence as defendant did not address all RAP 9.11 requirements).

Robertson highlights various portions of the record that he claims could show ineffective assistance but are too underdeveloped to present an argument on appeal. For example, he discusses the multiple objections to the continuances his attorney sought. After conviction, Robertson suggested his attorney had misrepresented the work he was doing as the bases for these continuances, suggesting "dilatory conduct sacrificed his right to a speedy trial." Robertson also notes that despite telling the jury in his opening statement that it was going to hear from Robertson's family members, including his mother, about violent encounters he had experienced, defense counsel never called his mother as a witness and "elicited next to nothing in terms of specific experiences of past violence that would have informed Robertson's perception of danger on the day in question." He also highlights that defense counsel did not present any expert witnesses on how Robertson's "past exposure to violence may have affected his perception of danger on the day in question," as it related to his self-defense claim.

Robertson contends that he was told he could make a record at sentencing about his concerns with his counsel but was ultimately dissuaded from doing so and was assured that one had already been made. The record shows that after the verdict was returned, Robertson expressed concerns that he had been "misrepresented" by counsel, highlighting the continuances his attorney sought, evidence at trial that his attorney did not share with him, and the minimization of his mental health and "psych evaluation." The court responded that the concerns were on the record and that Robertson would have an opportunity to speak at sentencing as well. At sentencing, Robertson again asked to discuss the issues but was assured by his sentencing counsel[8] that he had created a sufficient record for appeal. He now requests this court to exercise discretion and remand for further proceedings under RAP 9.11 and RAP 12.2.

Both RAP 9.11 and RAP 12.2 limit a court to pursuing additional evidence or taking actions for the purpose of resolving "the merits of the case." The first two requirements of RAP 9.11 require "additional proof to fairly resolve the issues *on review*," and that "the additional evidence would probably change *the decision being reviewed*." RAP 9.11(a)(1), (2) (emphasis added).

In support of his request, Robertson cites State v. Jones, 183 Wn.2d 327, 352 P.3d 776 (2015). In Jones, after trial concluded, defendant's attorney withdrew, and new counsel filed a post-trial motion asserting IAC due to prior counsel's failure to interview and present testimony of two favorable witnesses. Id. at 335. The trial court concluded that the failure to interview the witnesses was "not prejudicial." Id. at 336. The court of

---

[8] A different attorney stood in for Robertson's trial counsel at sentencing.

appeals affirmed. Id. On review, the Washington Supreme Court ordered a RAP 9.11 hearing and directed the trial court to take additional evidence and make factual findings as to the alleged IAC claim. Id. Following the RAP 9.11 hearing, the Washington Supreme Court reversed and held that the defense trial counsel's performance was constitutionally deficient. Id. at 347.

Unlike in Jones, in which the defendant explicitly raised the same IAC issues as to which he sought the RAP 9.11 hearing on appeal, here, Robertson suggests there could be *more* IAC claims, and, indeed, acknowledges the record is "not enough to make a viable argument on appeal in relation to those concerns." Additionally, while Robertson appears to address RAP 9.11's third requirement—i.e., that it is equitable to excuse his failure to present the evidence to the trial court given the advice he was provided by his counsel and the court—he does not address the other six RAP 9.11 requirements for additional evidence to be considered on review. Here, we agree with the State that remand under RAP 9.11 and 12.2 is inappropriate, as "direct appeal is limited to the existing record and Robertson is not entitled to supplement it to raise *more* claims."[9]

## II.  Prosecutorial Misconduct

Robertson argues he was denied a fair trial given prosecutorial misconduct in the State's opening and closing arguments. He asserts that the State improperly made a

---

[9] Both parties agree he could raise these additional IAC issues in a personal restraint petition. The State claims that Robertson should have filed a concurrent personal restraint petition as the appropriate vehicle to develop evidence or facts not in the existing trial record. See State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995) ("If a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition, which may be filed concurrently with the direct appeal."). In reply, Robertson agrees with the "general proposition" that "a personal restraint petition is the proper procedural mechanism when a legal claim relies on evidence outside of the record."

"tailoring" argument, appealed to emotions and community safety, and provided a personal opinion. We disagree.

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). "Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." Id. at 703-04.

If "we find that a prosecuting attorney's statements were improper, we must then determine whether the defendant was prejudiced under one of two standards of review." State v. Allen, 182 Wn.2d 364, 375, 341 P.3d 268 (2015). If the defendant made a timely objection at trial, they must demonstrate the prosecutor's improper conduct " 'resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.' " Id. (quoting State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012)). "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Id. at 762. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict. Id. at 761.

A. Generic Tailoring

"Under both the United States and Washington Constitutions, a defendant has the right to 'appear and defend in person,' to testify on their own behalf, and to confront witnesses against them." State v. Carte, 27 Wn. App. 2d 861, 870, 534 P.3d 378 (2023) (quoting U.S. CONST. amend. VI; WASH. CONST. art. I, § 22). An argument by the State that the defendant "tailored" their testimony can infringe on this right, as it alleges "the defendant conformed their testimony to the evidence they observed while attending trial." Id. at 871. "Tailoring arguments are considered 'specific' if derived from the defendant's actual testimony, including both direct testimony and cross-examination." Id. "Tailoring arguments are considered 'generic,' however, if based solely on the defendant's presence at the proceeding and not based on the defendant's direct examination or cross-examination." Id. "[A] generic tailoring argument raised only in the prosecution's closing argument and untethered to the defendant's direct testimony or cross-examination violates article I, section 22 of the Washington Constitution." Id. at 873.

Here, in its rebuttal closing argument, the State discussed the plausibility of there being a second shooter and disputed Robertson's argument that his testimony was not self-serving. The State continued:

> Because his credibility obviously is at issue and the embellishments and the exaggerations particularly on this point -- this insistence of there being a second shooter and somebody who was returning fire at him, he has no credibility under the circumstances. And clearly his testimony is self-serving. And it's clearly tailored to the facts in hindsight on that video.

Robertson did not object contemporaneously to the State's comment.

18

In State v. Berube, during closing argument, the State was permitted to make comments based on direct examination of the defendant, and without cross examination, as a "logical attack on the defendant's credibility." 171 Wn. App. 103, 116-17, 286 P.3d 402 (2012). Because the prosecutor explicitly used the conflicting testimony between the defendant and another witness to support its challenge to defendant's credibility, the court held this was not a generic tailoring argument. Id. 114-115, 117.

Here, by contrast, the State did not discuss any specific portion of Robertson's testimony that was inconsistent or later conformed to specific facts that arose at trial.[10] Robertson neither provided a pre-trial statement, nor was there any admission on the stand that he changed his testimony. Rather, he consistently argued self-defense and testified to his perspective of the event. Accordingly, the State's closing argument that

---

[10] At oral argument before this court, the State cited to this portion of Robertson's trial testimony:

Q[uestion (Q)]: That's when you noticed that this guy had the firearm in his hand?
A[nswer (A)]: I said that's when he dropped the window and then boom, he was like debating it. Like I don't know. He was debating it or something. I don't know.
Q: Well, you're telling the jury now that he was debating it. Didn't you previously testify that it was -- happened in a matter of seconds that he reached down and pulled the gun out?
A: I mean, I said this whole thing happened in a matter of seconds.
Q: Okay.
A: And you're trying to mix it up. But what I said was he -- he came out from the gas pump. He had the window down. He start going, but he's like ah -- he's debating it or something. I don't know. I don't know if he's looking for the timing. I don't -- I don't know. I'm not too sure. And that's when I see him brandish the gun.
Q: Well, do you recall telling Mr. Moore anything about this guy debating whether or not to shoot at you?
A: No, I didn't say whether or not. I said when when. Obviously, 'cause he was gonna do it.
Q: Thank you.
A: It was about timing for him. I don't know.

Wash. Ct. of Appeals oral argument, State v. Robertson-Butler, No. 86443-2-I (Sept. 19, 2025), at 17 min., 06 sec. through 18 min., 09 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025091048/?eventID=2025091048. Even if this exchange indicates some inconsistency and perhaps an opening to an attack on credibility, in its closing argument, the State did not make a specific connection to this testimony.

Robertson "tailored" his testimony to the video he viewed at trial, without tethering it to specific testimony, violated article I, section 22 and was improper.

However, to establish reversible misconduct, Robertson must also show the error caused prejudice. Because Robertson did not object at trial, the heightened standard applies, which requires a showing that (1) no curative instruction could have eliminated the prejudicial effect and (2) there was a substantial likelihood the misconduct led to prejudice that affected the jury verdict. Emery, 174 Wn.2d at 761. We conclude Robertson does not meet this burden.

Here, had Robertson objected at trial, the trial court could have "stricken the remark and instructed the jury not to draw any adverse inferences from his testimony." Carte, 27 Wn. App. 2d at 874. Because we presume jurors follow the court's instructions, State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013), Robertson does not satisfy his burden of showing that no curative instruction could have eliminated the prejudicial effect.

Furthermore, Robertson cannot show there was a substantial likelihood that the misconduct affected the verdict. While he is correct that courts have previously recognized that remarks made in rebuttal are more likely to create prejudice, "this alone is insufficient to create incurable prejudice." Carte, 27 Wn. App. 2d at 874. Instead, "we look to the pervasiveness of the misconduct." Id. While a "single fleeting improper comment is likely curable," "prejudice may be unavoidable when an improper argument is repetitive and thematic." Id. at 874-75 (citing State v. Brown, 21 Wn. App. 2d 541, 571, 506 P.3d 1258 (2022) ("Any error was fleeting as opposed to pervasive and prejudicial.")).

Here, the prosecutor's argument was lengthy and consisted of approximately 41 pages of transcript. The improper statement was a single comment, one that the State did not repeat or weave into its argument as a theme. Therefore, there is not a substantial likelihood the misconduct affected the verdict, and Robertson-Butler is unable to show the error was flagrant, ill intentioned, and incurable.

B.  Appeal to Emotion and Protecting the Community

It is improper conduct for a prosecutor to ask jurors to convict in order to protect the community or to send a message to deter future law-breaking. State v. Ramos, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011) (holding it was improper for prosecutor to ask the jury to convict to prevent drug dealers from engaging in "drug activity" in the community); State v. Perez-Mejia, 134 Wn. App. 907, 916, 143 P.3d 838 (2006) ("a prosecutor engages in misconduct when making an argument that appeals to jurors' fear and repudiation of criminal groups").

For example, in Ramos, which Robertson cites in support of his claim, the court held that improper requests to protect the community were incurably prejudicial, as "the prosecutor's argument was not based on the evidence and was not isolated." 164 Wn. App. at 340. There, the prosecutor argued:

> In the course of this trial you probably learned things about drug activity in the community that you had no idea was going on. You have actually seen videotape of drug activity in this community. Most of you had no idea what is going on and probably wish you didn't know it was going on. But the events that are depicted in the video you saw this morning of March 25th of 2009 is [sic] why the detectives were out there at that parking lot on that date to investigate drug crimes. This is also why we are here today, so people can go out there and buy some groceries at the Cost Cutter or go to a movie at the Sunset Square and not have to wade past the coke dealers in the parking lot. That's why they were there, that's why you're here, and that's why I'm here, to stop Mr. Ramos from continuing that line

of activities. That's what the case is about and that's what the truth of this case is about and that's why this is a serious case.

164 Wn. App. at 338. The court reasoned there was no evidence that the defendant continued to engage in drug activity or drug dealing in the community. Id. at 340. "To the contrary, the evidence established" that another party coordinated the transaction in a local parking lot. Id. The Ramos court also found it particularly concerning that the State's argument was made at the beginning of closing argument, thus operating as a "prism through which the jury should view the evidence." Id.

At Robertson's trial, the State's opening statement began as follows:

There are certain public spaces in American life where many of [us] take our [sic] safety for granted. And in particular I'm talking about the mundane spots that we sometimes pass through without a lot of conscious thought while we're running errands or just going about our day. So the grocery store, the coffee shop, the dry cleaners. Nobody expects those places to turn into combat zones with bullets suddenly whizzing over your head. Nobody expects to have to drop to the ground at a moment's notice to avoid being struck by gunfire. And in short, nobody expects to have their sense of security abruptly upended by a random act of violence.

. . . .

And when the defendant shattered the calm of that sunny afternoon by discharging his firearm in public he committed the three offenses with which he's currently charged with today. Drive-by Shooting in Count One; Assault in the Second Degree in Count Two; and Unlawful Possession of a Firearm in the First Degree in Count Three. Crimes for which we will have proof beyond a reasonable doubt at the end of this trial. And just as importantly, crimes for which there was no lawful justification.

. . . .

In fact, they're going to tell you precisely the opposite which is that this was by all account a pleasant, uneventful sunny afternoon that was disrupted by the senseless act of violence that endangered the lives of a host of people.

And that's completely corroborated, I would add, by additional surveillance video that you're going to see from an AM/PM

22

convenience store across the street from the Chevron that was positioned in Mr. Robertson's line of fire.

Robertson did not object to these comments.

We consider the prosecutor's conduct in the context of the record and the circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Here, unlike the explicit requests in Ramos to convict the defendant based on protecting the community and a lack of evidentiary support of the assertions, the State did not make similar requests. Instead, the State described a scenario that multiple witnesses would later corroborate. Indeed, immediately following this introduction in its opening argument, the State summarized the series of events that took place that day.[11] The State's challenged argument was based on anticipated evidence that was eventually presented at trial. Accordingly, Robertson does not demonstrate the comments were improper.

### C. Personal Opinion

Robertson challenges comments by the prosecutor about what "the State believes" the evidence demonstrated and what the State "think[s]" about the evidence. Ordinarily, it is improper for a prosecutor to express a personal opinion concerning the

---

[11] After the introduction, the State asserted:

> But that's what happened in this case. On a late summer afternoon in September of 2021 the defendant, Mr. Robertson-Butler, arrived in a vehicle at the Chevron Gas Station in Renton on South Brady [sic] way.
> Barely 60 seconds later, much to the dismay of innocent bystanders, he stepped out of the rear passenger seat of that vehicle and he began spraying bullets at an unknown person with a 40 caliber semi-automatic handgun. A weapon that he was legally prohibited from possessing and that should never had made its way into his hands.
> He then immediately hopped back into the same vehicle which fled from the scene and briefly attempted to evade the police before it came to a stop. And Mr. Robertson was ultimately arrest[ed] minutes later less than a mile from the gas station.

defendant's guilt. State v. McKenzie, 157 Wn.2d 44, 53, 134 P.3d 221 (2006). However, "[i]n the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).

> In closing argument, the prosecutor argued, in relevant part:
>
> All right. So, let's talk then about how the evidence looks in this case and why the State has, in fact, proven that Mr. Robertson-Butler did not act in lawful self-defense on September 7th, 2021. And the first component I want to address before I play this video here is the first one, right? The issue of a subjective belief of impending harm. And I bring that up because the State believes the evidence has clearly demonstrated that the defendant did not see what he claims to have to seen on that day. All right?

Later, in rebuttal, the State discussed the plausibility of a second shooter in the context of the evidence and Robertson's testimony, stating, "Well, I don't think the evidence b[ears] that out and what the State would submit to you, in fact, is that the best witness in the State's entire case in this trial, was Mr. Robertson-Butler." Robertson did not object to either of these statements.

Given the context of the State's entire argument, we conclude that the challenged remarks were not improper, as the State drew reasonable inferences from the evidence. Following the initial comments, the State discussed the specific evidence that contradicted Robertson's testimony. Other witnesses did not discuss either seeing another person with a weapon or hearing gunfire coming from two directions. The video evidence did not support the theory that a second shooter was present, and the State noted that some of the physical evidence—shell casings—was found only in the general area from which Robertson shot. And the State's comment during rebuttal, "I don't think

24

the evidence b[ears] that out," was directly in response to Robertson's closing argument that his testimony and the lack of evidence in the State's case undercut the State's ability to meet its burden of proof. See State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994) (prosecutor may also argue that the evidence does not support the defense theory). Accordingly, given the entirety of the State's argument, Robertson cannot show that the use of "I" or "the State" qualified as a personal opinion concerning Robertson's guilt and was improper.

III. Cumulative Error

Robertson argues that the accumulation of errors—ineffective assistance for failing to propose jury instructions, comment on the exercise of a constitutional right and prosecutorial misconduct, and ineffective assistance in failing to object to misconduct—produced an unfair trial. We disagree.

As discussed above, Robertson does not satisfy his burden to demonstrate counsel was constitutionally ineffective for failing to propose jury instructions. "[T]he cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect." State v. Walker, 164 Wn. App. 724, 737, 265 P.3d 191 (2011) (citing State v. Case, 49 Wn.2d 66, 73, 298 P.2d 500 (1956)). But here, the prosecutor's comments concerning protection of the community and personal opinion were not improper, and Robertson's IAC claims based on those comments fail as well. Even if the generic tailoring argument was improper and counsel was deficient for failing to object to the argument, Robertson cannot show prejudice because the single, fleeting comment was insufficient to change the result of the proceeding.

Accordingly, the single instance of improper tailoring does not establish a cumulative negative effect requiring reversal.

IV.  Community Custody Conditions

Robertson argues that "[i]nfirm community custody conditions must be stricken" from his judgment and sentence. Specifically, he contends that the geographic restriction is vague, in violation of due process and that the court cannot require a mental health evaluation and treatment absent a statutorily mandated finding. We disagree.

A.  Condition Imposing Geographic Boundaries

Robertson challenges the community custody condition that states he must "[r]emain within geographic boundaries, as set forth in writing by the Department of Corrections Officer [sic] or as set forth with SODA[12] order." This court recently addressed a nearly identical community custody condition and held it was not unconstitutionally vague. State v. Lundstrom, 34 Wn. App. 2d 977, 979-83, 572 P.3d 1243 (2025). We adopt the reasoning set forth in Lundstrom and likewise conclude the same condition in Robertson's sentence is not unconstitutionally vague.[13]

B.  Mental Health Evaluation

As a condition of community custody, the court ordered, "Defendant shall obtain a mental health evaluation and follow all prescribed treatment, including appointments and medication." Robertson argues that the "court's failure to find he suffers from a

---

[12] SODA stands for "Stay Out of Drug Area."

[13] Robertson raises a separate issue not addressed in Lundstrom, that the restriction to boundaries set forth in a SODA order is not crime-related and therefore should be stricken. The State counters that because no SODA order was issued, we need not address the issue. We agree with the State.

statutorily defined mental illness that contributed to the offense bars imposition of the condition." We disagree.

"A trial court may only impose a sentence [that] is authorized by statute." State v. Barnett, 139 Wn.2d 462, 464, 987 P.2d 626 (1999). RCW 9.94B.080 permits a trial court to order

> an offender . . . to undergo a mental status evaluation and to participate in available outpatient mental health treatment, if the court finds that reasonable grounds exist to believe that the offender is a mentally ill person as defined in RCW 71.24.025, and that this condition is likely to have influence the offense. An order requiring mental status evaluation or treatment may be based on a presentence report and, if applicable, mental status evaluations that have been filed with the court to determine the offender's competency.

RCW 71.24.025(42) defines "mentally ill persons" as "persons and conditions defined in in subsections (3), (13), (52) and (53) of this section." RCW 71.24.025(43).[14] Failure to make the requisite findings that someone is a "mentally ill person" under RCW 71.24.025 is error and can result in either striking the condition or necessitating remand. State v. Jones, 118 Wn. App. 199, 209, 76 P.3d 258 (2003) (ordering mental health evaluation condition be stricken for, among other things, failure to find defendant was a person whose mental illness had contributed to their crimes); State v. Shelton, 194 Wn. App. 660, 675-76, 378 P.3d 230 (2016) (accepting State's concession that remand was necessary to determine whether to order a mental health evaluation, as court failed to find defendant was a "mentally ill person as defined in RCW 71.24.025").

Robertson argues that the court did not make appropriate findings because it did not explicitly find he was a mentally ill person under RCW 71.24.025(3). In the

---

[14] In the statute effective during Robertson's sentencing, this definition was located in subsection 41. Former RCW 71.24.025(41) (2024). As the definitions are the same, we cite to the current statute.

alternative, he claims that the evidence does not support a finding that he was suffering from an acute mental illness. Robertson disagrees that his PTSD diagnosis qualifies as an "acute mental illness limited to a short-term severe crisis episode" as defined under RCW 71.24.025(3). Rather, he argues that the record reflects his PTSD is a chronic condition and therefore he does not qualify as a mentally ill person under RCW 71.24.025(3), which is one of the "predicate[s] for valid entry of an order imposing the mental health condition."

However, the court did make a series of findings and conclusions to support the exceptional sentence downward. The findings were based on the presentencing report—which included jail health records documenting his PTSD and letters acknowledging his struggles with mental health—Robertson's own acknowledgement of his mental health struggles, and his mother's testimony concerning the difficulties he experienced and his need for "some type of mental health treatment." The court found that Robertson had been diagnosed with PTSD and "showed symptoms of his condition prior to this offense and afterwards." Because of this diagnosis, it concluded that Robertson's "capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired by his youthfulness and PTSD symptoms."

Further, RCW 71.24.025(3) defines being "acutely mentally ill" as "a condition which is limited to a short-term severe crisis episode of . . . (a) [a] mental disorder as defined in RCW 71.05.020." A " 'mental disorder' means any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(39). Although the court did not explicitly enter a

finding that Robertson was a "mentally ill person" under RCW 71.24.025(3), it did enter findings sufficient to establish he experienced "a short-term severe crisis episode" of his PTSD, a chronic condition at the time of the crime of conviction. While the court declined to impose a MHSA, its findings supported the exceptional sentence downward. Thus, we conclude that the findings were sufficient to support the court's order requiring a mental health evaluation.

CONCLUSION

Affirm.

_____ Cheng, J.

WE CONCUR:

_____, ACJ          _____ Mann, J.